SOLEDAD ORTEGA DE ARGUELLO, JOSE RAMON ARGUELLO, AND S. M. MEZES v. JOHN GREER, MARIA LOUISA GREER, MANUELA COPPINGER, JAMES MORRISON, JOSEPH B. CROCKETT, ALEXANDER P. CRITTENDEN, AND DENNIS MARTIN.

INCHOATE OR IMPERFECT MEXICAN GRANT OF LAND.—If a grant of land made by Mexico in California, before its cession to the United States, required as one of its conditions that the land should be measured by the proper officer, and judicial possession should then be given to the grantee; until the measurement and deliv-

ery of possession, the legal title remained in the Mexican nation, and the grantee acquired only an imperfect or inchoate title.

RIGHT TO DETERMINE VALIDITY OF INCHOATE MEXICAN GRANT OF LAND.—So long as a grant of land made by Mexico in California was imperfect or inchoate, the right to determine the validity of the grant and give it precise location remained in the Mexican Government until California was transferred to the United States, and with that event this right passed to the United States, and when this right is exercised by the United States the grantee is bound by its decision and cannot demand more or other land than that allotted to him.

THIRD PERSONS NAMED IN ACT OF CONGRESS OF MARCH, 1851.—Persons having an inchoate or imperfect grant of land made by Mexico in California before its cession to the United States, are not "third persons" within the meaning of the fifteenth section of the Act of Congress passed March, 1851, entitled "an Act to ascertain and settle private land claims in the State of California."

SAME.—"Third persons," mentioned in said Act, are those who have an interest in the land which would enable them to resist successfully any action of the Government respecting it.

NATURAL OBJECTS CONTROL BOUNDARIES.—If a decree made by a Court of the United States, confirming a Mexican grant of land, describes its boundaries by permanent natural objects, and also by courses and distances, with a mention of the quantity, the description by courses, distances, and quantity, must yield to the boundaries by natural objects, if they do not agree.

GRANTEES BOUND BY SURVEY OF GRANT BY THE U. S.—Where an inchoate grant was made by Mexico of a valley, (giving its name,) which valley was bounded by a range of hills, and the United States confirmed the grant, and in surveying the same fixed its boundary at the foot of the range of hills, leaving out their slope, and the grantees who were parties to the act of confirmation made no objection to this survey ; *Held,* that the grantees and their privies were bound by this action of the Government, and it was conclusive.

APPEAL from the District Court, Twelfth Judicial District, City and County of San Francisco.

The facts are stated in the opinion of the Court.

*J. B. Crockett,* for Appellants.

The defendants can impeach the plaintiffs' patent and survey. They are *third* persons within the true intent of the fifteenth section of the Act of Congress of 3d March, 1851, establishing the Land Commission. Their title was derived from the Mexican Government anterior to the conquest, and the fifteenth section of the Act of 1851 was inserted for the express purpose of preventing persons holding title under the former Government from being precluded by an adverse patent and survey. Under the Acts organizing commissions to adju-

dicate land claims upon the acquisition of Louisiana and Florida, enormous hardships had occurred for the want of such a provision. Under these Acts, the Courts held that the *first* confirmation and patent carried the title absolutely as against all adverse claimants, and the proceedings being *ex parte*, the result was that in many cases the true owner lost his land because some one else had obtained a prior confirmation and patent. To remedy this great grievance, Congress inserted the fifteenth section in the Act of March 3, 1851, which provides " that the final *decrees* rendered by the said Commissioners, or by the District or Supreme Court of the United States, or any *patent* to be issued under this Act, shall be conclusive between the United States and the claimants only, *and shall not affect the rights of third persons.*" In other words, the patent is to operate only as a quitclaim on the part of the Government, and shall not affect the rights of third persons, which are to remain as valid as if no decree had been rendered or patent issued. The only difficulty under this section was to ascertain who are " third persons " within the meaning of the Act. Our Supreme Court in many cases have properly held that persons deriving title or claiming under the United States *since* the cession of California, are not such third persons. The decree and patent are obligatory on the United States, and are of course binding on their grantees; and in the case of *Leese* v. *Clark*, 20 Cal. 425, the Court holds that persons holding under grants made by American Alcaldes during the military occupation of the country, and prior to the cession, derive title from the United States and not from the Mexican Government, and therefore are not the " third persons " contemplated by the fifteenth section. They are bound by the patent, because their grantor, the United States, is bound by it. But in that case, and also in *Teschemaker* v. *Thompson*, 18 Cal. 27, the Court defines, with great precision, who are such " third persons " as are not bound by the decree and patent. The defendants in this case come strictly within this ruling.

The defendants are not estopped by their own survey and patent in respect to boundaries, *as against an adverse claimant.*

78

It may be that the patent and survey, so long as they remain in force, are conclusive as between the claimant and the Government, who are parties to the proceeding. Neither could impeach them in a collateral proceeding, because as *between them*, the whole question has been finally adjudicated. But it was manifestly not the intention of Congress to render the action of its Board of Commissioners and its Surveyor-General obligatory upon either party in a contest between private claimants as to conflicting boundaries. The Government had no interest in such contests, and provided no machinery for settling such disputes. If the land in contest properly belongs to the Coppinger Ranch, we *have* an equity which bound the conscience of the Mexican Government. If that Government granted the land to Coppinger, it was bound in good faith to perfect the grant into a perfect title, and the United States, as the successor to Mexico, was bound in like manner; and when it wrongfully conveyed the legal title to the claimants of the Pulgas, they are affected with our equities in the same manner and to the same extent as the Government was.

Nor is there anything in the Act establishing the Land Commission to impair the force of this trust. The Commission was intended mainly to separate private lands from the public domain, and not in any degree to adjudicate conflicting claims between private individuals.

*Sidney L. Johnson*, for Respondent.

The appellants are estopped from demanding anything beyond their own survey and patent.

The Act of March 3d, 1851, was passed for the purpose of ascertaining and settling private land claims in the State of California. It provides for an investigation by Commissioners, and for a review of the decision of the Commissioners in the District and Supreme Courts of the United States. By the thirteenth section, all lands, the claims to which shall have been finally rejected by the Commissioners, or shall be finally decided to be invalid by the District or Supreme Court, or the

claims to which shall not have been presented to the Commissioners within two years after the date of the Act, shall be deemed, held, and considered as part of the public domain of the United States ; and for all confirmed claims a patent shall issue to the claimant, upon his presenting to the General Land Office an authentic certificate of such confirmation, and a plat or survey of the land duly certified and approved by the Surveyor-General of California, whose duty it shall be to cause all private claims which shall be finally confirmed to be accurately surveyed, and to furnish plats of the same ; and in the location of the said claims, the said Surveyor-General shall have the same power and authority as are conferred on the Register of the Land Office and Receiver of the Public Moneys of Louisiana, by the sixth section of the Act to create the office of Surveyor of the Public Lands for the State of Louisiana, approved March 3d, 1831.   That section provides " that in relation to all such confirmed claims as may *conflict or in any manner interfere with each other*," the officers named " are hereby authorized to decide between the parties, and shall in their decision be governed by such conditional lines or boundaries as have been, or may be, agreed upon between the parties interested, either verbally or in writing ; and in case no lines or boundaries be agreed upon between the parties interested, then the said Register and Receiver are hereby authorized to decide between the parties in such manner as may be consistent with the principles of justice ; and it shall be the duty of the Surveyor-General of said State to have those claims surveyed and platted in accordance with the decisions of the Register and Receiver ; *provided*, that the said decisions and surveys and the patents which may be issued in conformity thereto, shall not in anywise be considered as precluding a legal investigation and decision by the proper judicial tribunals between the parties to any *such interfering claims*, but shall only operate as a relinquishment on the part of the United States of all title to the land in question."   (4 Stat. at Large, p. 494.)

A similar power had been conferred upon these officers by

the fourth section of the Act of May 8th, 1822, (3 Stat. page 708,) but without the proviso that such decision should not preclude a judicial investigation.

The counsel for appellants endeavors to find in this provision an escape from the estoppel, which we say results from the submission by the Coppingers of their claim to the tribunals constituted by the Act of 1851, and the final determination, survey, and patent of their claim under that Act.

We assume that the Act of 1851, in giving to the Surveyor-General of California the powers given to the Surveyor-General of Louisiana in the sixth section of the Act of 1831, gave them subject to the proviso in that section. If, then, the Pulgas and Coppinger claims had been such interfering claims as are spoken of in that section, the line established between them by the Surveyor-General would not have precluded a legal investigation and decision by the proper judicial tribunal, between the parties to such interfering claims.

Are they interfering claims? The Coppinger grant calls for the senior Pulgas grant as its western boundary. Where the one ends the other begins. How, then, can they interfere, overlap, or in any manner conflict? Two claims conflict or interfere when both include, in whole or in part, the same land. It is impossible to satisfy both of them. In such case, and in such case only, the line established by the surveyor may be the subject of investigation and decision by the proper judicial tribunal. In all other cases the survey and patent are conclusive.

By the Court, CURREY, J.

The plaintiffs being in possession of certain real property described in the complaint, brought an action as authorized by the two hundred and fifty-fourth section of the Practice Act, against the defendants as persons claiming some estate or interest therein adverse to the plaintiffs, for the purpose of determining such adverse claim, estate or interest.

The premises in controversy are situated in San Mateo

County, and constitute as claimed by the plaintiffs a part of the " Rancho de las Pulgas, or the Pulgas Rancho," as the same has been surveyed and patented under the authority of the United States Government.

The answer of the defendants admits that at the time the action was commenced, and when the answer was filed, the plaintiffs were in possession of the premises, and interposes as an equitable defense and as ground for affirmative relief the following facts :

First—That the plaintiffs' title is founded on a Mexican grant, confirmed by a decree of the Supreme Court, and that the same has been surveyed and patented.

Second—That the decree of confirmation does not embrace the land in controversy, but that by a mistake of the Surveyor-General and the Commissioner of the General Land Office an erroneous survey was made, which improperly includes the disputed premises, in violation of the decree of confirmation, and that the patent follows the erroneous survey, including the premises therein.

Third—That the defendants are the true owners of the same lands, under a grant from the Mexican Government to Juan Coppinger, which grant has been finally confirmed by metes and bounds embracing such lands.   In conclusion the defendants pray that their titles may be adjudged to be superior to that of plaintiffs, and that the plaintiffs be decreed to release the legal title which they acquired under their erroneous survey and patent.

The plaintiffs by replication controvert the material allegations of the affirmative matter contained in the answer, besides pleading affirmatively matters in bar and estoppel to the facts on which the defendants rely for a judgment and decree in their favor.

When the cause came on for trial the parties stipulated as to certain facts, upon which and the pleadings the plaintiffs moved for judgment.   The Court granted this motion, and rendered judgment for plaintiffs against the defendants in

accordance with the prayer of their complaint, from which the defendants have appealed.

The defendants maintain that they are in equity the owners of the lands in controversy, and that at most the plaintiffs are but the trustees of the defendants, holding for their use the legal title of the premises, and they insist that the pleadings, stipulation and proofs in the case authorized and required a judgment and decree in their favor as prayed for in their answer, which was in the nature of a cross bill in equity.

In order to avoid prolixity we shall in the course of this opinion refer only to such facts appearing in the record as may be necessary to a clear understanding of the case as connected with the legal questions to be determined.

In 1835 there was granted by the Mexican Government to José Ramon Arguello, Luis Arguello, Maria Concepcion Arguello and Maria Josefa Arguello, children of Luis Arguello, then deceased, a tract of land called "Las Pulgas," situate within the present County of San Mateo, the boundaries of which were specified in the grant in the following words: "On the south the Creek of San Francisquito, on the north that of San Mateo, on the east the estuaries, and on the west the Cañada de Raimundo." In a subsequent part of the grant are the words: "The tract of which mention is made is of four leagues of latitude and one of longitude." The grant contains no reservation of any excess of four square leagues that might be within the locative calls of the description, to the nation for its uses, as was generally the case when it was intended to grant a particular quantity of land lying within limits of larger extent. In due time after the organization of the Board of Commissioners appointed under the Act of the Congress of the United States, passed in March, 1851, entitled "An Act to ascertain and settle the private land claims in the State of California," the claimants of the Las Pulgas presented their petition to the Board for the confirmation of their alleged title thereto. The Board confirmed the claim, describing the land substantially as in the grant, and adding the words, "said land being of the extent of four

leagues in length and one in breadth, be the same more or less." From this decree the case was removed by appeal to the proper District Court, where the claim was again confirmed, and then an appeal was taken by the parties respectively from the decree of the District Court to the Supreme Court. That Court, upon the final hearing of the cause, after expressing the opinion that the judgment of the District Court was correct, pronounced judgment as follows : " It is adjudged that the said claim of the petitioners is valid as to that-portion of the land described in the petition which is bounded as follows, to wit : On the south by the arroyo or Creek of San Francisquito ; on the north by the Creek of San Mateo ; on the east by the esteros or waters of the Bay of San Francisco ; and on the west by the eastern borders of the valley known as the ' Cañada de Raimundo,' said land being of the extent of four leagues in length and one in breadth, be the same more or less ; and it is therefore hereby decreed that the said land be and the same is hereby confirmed to them ;" and then follows a designation of the proportions of the premises which each confirmee should have and hold under the confirmation ; and then it is further decreed that " as to the portion of the premises described in said petition which is not included within the boundaries above mentioned, the claim of the petitioners is adjudged not to be valid." (*Arguello et al.* v. *United States*, 18 How. 549.)

It should be observed here that the confirmees, in their petition, presented to the Board of Land Commissioners asking for the confirmation of Las Pulgas, claimed that the tract of land granted contained twelve square leagues, including the valley called the Cañada de Raimundo ; and hence that part of the decree declaring that " as to the portion of the premises described in said petition which is not included within the boundaries above mentioned, the claim of the petitioners is adjudged not to be valid," is to be understood as applying to the portion of the tract of land described in the petition lying without the boundaries specified by the decree.

After the final confirmation the land was surveyed by the

Government Surveyor. This survey was approved, and in October, 1857, a patent in the usual form was issued to the confirmees describing the land as surveyed, and as described in the final decree of confirmation on the north, east and south side; and on the west side the line is at the western base of the range of hills which bounds the Cañada de Raimundo or Valley of Raimundo on the east. The area comprehended by the description of the survey and patent is about thirty-five thousand acres.

The defendants claim the western portion of the lands embraced in the Las Pulgas patent, under a grant made in August, 1840, by the Mexican Government to Juan Coppinger, of the place known as the "Cañada de Raimundo," adjoining to and west of the Las Pulgas. The record shows that in July, 1839, Coppinger by petition addressed to the Prefect of the First District, sought to obtain a grant of a certain tract of land which he represented as "a small valley which lies in the Sierra in the same place where there now is a small timber cutting establishment, which place is about two and one half leagues in length and about three quarters of a league in breadth at the utmost; said valley borders on the Rancho of Donna Soledad Ortega and that of Maximo Martinez, and also on the Sierra, at the extremity, as it appears from the accompanying sketch." The grant which was afterwards made to Coppinger described the Cañada de Raimundo as "bordering on the west by the Sierra Morena; on the east by the Rancho de las Pulgas; on the south by that of Señor Maximo Martinez, and on the north with the lagoon." This grant had annexed to it certain conditions or specifications, one of which was, that "when the property shall have been confirmed to him he shall solicit the proper magistrate to give him judicial possession thereof." Another was, that "the land of which donation is made is that between the boundaries shown by the sketch he has presented. The Judge who shall give possession of it shall have it measured according to ordinance, specifying the amount of sitios it contains." There is no provision in this grant reserving any surplus to the nation for its uses.

Some time prior to the year 1850 Juan Coppinger died, leaving him surviving an infant child, Manuela Coppinger, and a widow, Maria Louisa, as his heirs at law. The widow afterward became and now is the wife of the defendant John Greer. Greer and his wife and the said Manuela presented their petition to the Board of Land Commissioners, praying that the title to the Cañada de Raimundo might be confirmed to the said Maria Louisa and Manuela, as the heirs at law of Juan Coppinger, deceased. This petition was granted by decree of the Board, in which the land was described as in the original grant. On appeal to the District Court the claim of the petitioners was again confirmed, describing the land as it was described in the decree of the Board. This decree became final, and the Cañada de Raimundo was officially surveyed. The survey was approved, and in July, 1859, a patent was issued to the confirmees for the land as surveyed, comprehending within its limits about twelve thousand five hundred acres. The eastern line of the Cañada de Raimundo Ranch as described by this survey and patent coincided with the western line of the survey and patent of the Las Pulgas. But the defendants alleged that they refused to accept and receive the patent issued in July, 1859, and refuse to be concluded by it or by that of the Las Pulgas.

. The land in controversy is bounded on the south by the San Francisquito Creek; on the west by the line forming the western boundary of the Las Pulgas as described in the patent; on the north by the San Mateo Creek, and on the east by a line running from the San Mateo Creek to the San Francisquito Creek, at a distance of one league westward from the estuaries of the Bay of San Francisco. The defendants maintain that the Las Pulgas patent, to the extent that it embraces the land here described, was not authorized by the original grant nor by the final confirmation of it by the Supreme Court, and also that the same land is embraced in the tract granted to Juan Coppinger and in the decree of confirmation to his heirs; and that the survey and patent including this land was the result of a mistake on the part of the Government Sur-

79

veyor and the Commissioners of the General Land Office, and this mistake, it is contended, is established by reference to the original grants referred to and the final decrees of confirmation rendered by the tribunals of the United States.

The defendants claim that they come within the category of persons denominated third persons in the fifteenth section of the Act of Congress of 1851, and that the interest which they have under the original grant to Coppinger is of a quality that stands unaffected by the survey and patent of the Las Pulgas, and that they may impeach this patent by their answer and the proofs existing in' the case, in so far as it embraces the land in dispute.

The section of the Act here referred to reads as follows: " And be it further enacted, That the final decrees rendered by the said Commissioners or by the District or Supreme Court of the United States, or any patent to be issued under this Act, shall be conclusive between the United States and the said claimants only, and shall not affect the interests of third persons."

The first case passed upon by the Supreme Court of this State involving a construction of the section of the Act of Congress quoted and determining the character of persons and the interests that remained unaffected by a confirmation or patent, was the case of *Waterman* v. *Smith*, 13 Cal. 373.

In that case, which was an action of ejectment, Waterman claimed to recover upon a Mexican grant made to Francisco Solano, which had ripened into a perfect title by final confirmation and an approved survey and patent. Smith, the defendant, interposed as a defense the grant made by the Mexican Government to José Francisco Armijo, under which he derived his supposed right to the premises demanded, and which he relied on as the paramount title. The grants made to Solano and Armijo respectively embraced within their general boundaries more land than the quantity designated as granted, and overlapped each other, including in each the land in dispute; and both grants were regarded by the Court as inchoate and imperfect. The Court, in speaking of the effect of the patent

which the plaintiff introduced in evidence in that case said :
" The patent is conclusive evidence of the right of the pat-
entee to the land described therein—not only between himself
and the United States, but as between himself and a third per-
son who has not a superior title from a source of paramount
proprietorship" (p. 419) ; and of the third persons named in
the Act the Court said : " The third persons against whose
interests, by the fifteenth section of the Act of 1851, the final
confirmation and patent are not conclusive, are those whose
title is at the time such as to enable them to resist success-
fully any action of the Government in respect to it," (p. 420.)
In *Biddle Boggs* v. *Merced Mining Company*, 14 Cal. 362, the
Court reiterated this language employed in *Waterman* v. *Smith*,
and in *Leese* v. *Clark*, 20 Cal. 425, in reference to the same
subject, the Court say : " The term ' third persons' refers not
to all persons other than the United States and the claimants,
but to those who hold independent titles arising previous to
the acquisition of the country.  The latter class are not bound
by the decree and patent, for they do not hold in subordina-
tion to the action of the Government nor by any title .subse-
quent, but by title arising anterior to the conquest."

In *Minturn* v. *Brower*, 24 Cal. 644, this Court, after citing
the fifteenth section of the Act of 1851, say : " If such only
can be the effect of decrees and patents, and the interests of
third persons are not to be affected thereby, then who are
these third persons and what is the character of the interests
that stand unaffected ?   Third persons must be regarded to be
all persons who were not parties to the proceeding before the
Land Commission, or standing in such relation with those who
were parties thereto as to become affected and bound as privies;
and the interests of third persons that remained unaffected by
the final confirmation and patent are those subsisting in per-
fect titles derived from a source of paramount proprietorship,
which could be used in resisting successfully any action of the
Government respecting them."

These cases must be regarded as having settled the construc-
tion, so far as the Courts of this State are concerned, to be

given to this section of the Act of Congress. If Coppinger's heirs and successors in interest have an interest in the land in controversy of a character that could be used in resisting successfully any action of the Government respecting it, then they have a *status* in this case which entitles them to the relief they have sought, otherwise they are not in a position to complain of the action of the Government on whose bounty and justice they have depended for the confirmation of their claim to the Cañada de Raimundo.

It does not appear that the land granted to Coppinger was ever measured by the proper officer, as required by one of the conditions of the grant, nor that judicial possession of it was given to the grantee; hence it did not become definitively complete and valid under the former Government. (*Greer* v. *Mezes*, 24 How. 274; *United States* v. *Reading*, 18 How. 7, 8; *Leese* v. *Clark*, 18 Cal. 574; *Rodriguez* v. *Comstock*, 24 Cal. 87, 88.)

The only interest which Coppinger had in the land mentioned in the grant at the time California was ceded to the United States was what is denominated an inchoate or imperfect title, as contradistinguished from a perfect title. Before then the legal title to the land was in the Mexican nation, and upon the cession of the country the same passed to the United States, charged with the equitable interest of Coppinger therein, which the Government of the United States was in good faith bound to protect on such just terms as the Congress of the nation might devise and prescribe. The protection promised by the treaty of Guadalupe Hidalgo, and which without an express stipulation, it would have been the duty of the Government to afford, it was the design of the Act of Congress to effectuate, by providing the mode and means for the confirmation of such inchoate titles to lands as were equitable and just, and for investing those entitled to the same with indefeasible titles thereto. But to secure the speedy settlement of such land claims, the Act required their presentation within a specified period to the tribunal established for the purpose, providing that if they were not so presented such

lands should, from the lapse of limitation, be deemed, held and considered as part of the public domain. While the claimants of mere inchoate titles to lands had the right to demand of the Government the fulfilment of its obligations, they could not dictate the mode nor the exact measure of its performance. Then, when in any given case the Government has acted in the discharge of its duty, and has granted to a claimant the land to which it was deemed, under all the circumstances considered, he was equitably entitled, he is in no position to demand more nor otherwise than is allotted to him by the granting power.

The Coppinger claim was one requiring confirmation and segregation to render it a perfect title. The right to determine its validity and give it a precise location belonged to the former Government until the country was transferred to the United States. With that event the right passed to the new Government, and has been exercised in discharge of its obligation to the heirs of, and successors in interest to, the original grantee. If we may, after having ascertained the nature and quality of the interest of Coppinger, look into the *espedientes* of the Las Pulgas and the Cañada de Raimundo, and the evidence properly connected therewith, in order to discover the intention of the granting authority as to the quantity of land to be granted in each case, then what land was granted or intended to be granted to the respective grantees?

In his petition to the Prefect, Coppinger represented the land which he desired to obtain, as a small valley lying in the sierra, where there was a timber cutting establishment, and that such valley was at the utmost in extent about two and a half leagues long and three quarters of a league broad, and that it bordered on the rancho of Donna Soledad Ortega and that of Maximo Martinez, and also on the sierra at the extremity, as appeared from a map or sketch which was submitted with his petition. The grant made to him described the property as " the place known as ' Cañada de Raimundo,' bordering on the west by the Sierra Morena; on the east by the Rancho de las Pulgas; on the south by that of Señor Maximo Marti-

nez, and on the north with the lagoon." In the third speci-
fication or condition contained in this document it is declared
that "the land of which donation is made is that between the
boundaries shown by the sketch he has presented." This
sketch or map represents the valley or Cañada de Raimundo
in the midst of the hills by which it is bounded on the eastern
and western sides; and at its northern extremity the lagoon
is distinctly indicated. It is insisted on the part of the de-
fendants that the boundaries of the valley exhibited on the
map passed to the grantee by the terms of the grant as well
as the valley itself, and this position is sought to be strength-
ened by the fact that there was no reservation in the grant of
any surplus. We think the petition of Coppinger and the grant
itself with the map referred to is a refutation of this position of
the defendants. The petition describes the land solicited as a
small valley not exceeding certain specified dimensions and
names its surroundings. The grant calls it by the name by
which it was known, and specifies by what it is bordered, and
referring to the *diseño* or sketch presented with the petition,
declares the land donated—that is, the "Cañada de Rai-
mundo"—to be that between the boundaries shown by the
sketch.

As to the absence in the grant of a reservation of any sur-
plus, as was used in grants of a designated quantity to be
selected and set apart by the Government authority to the
grantee we are of opinion that this circumstance in no just
view aids the defendants' construction of the effect of the
grant. The petition had represented the valley of less area
than two square leagues, and acting upon it and the report of
the Prefect the Governor issued the grant to Coppinger for the
place known as the "Cañada de Raimundo," providing that
the Judge who should give him the possession of it should
have it measured according to ordinance, and should specify
the quantity of *sitios* or square leagues contained in it. It is to
be presumed that no reservation of any surplus was made,
because the Governor was aware, from "having previously
taken the necessary steps and investigations on the subject,"

as he says in the grant, that the valley did not exceed in extent the amount which the grantee might receive under the Mexican Colonization Law of 1824, and therefore no such reservation was necessary. The intention, as appears from these documents, was to grant the valley or Cañada de Raimundo and its appurtenances only.

It is maintained that the survey and patent on which the plaintiffs rely are not authorized by the confirmation in the Las Pulgas case; that the survey was made and approved under a misapprehension as to the effect of the decree of confirmation, and that the patent following the same is involved in the consequences of the mistake which was the result of such misapprehension.

In the original grant made to the Arguellos the western limit of the Las Pulgas (which is the disputed boundary in this case) was the Cañada de Raimundo. The four sides of the tract were defined with particularity by natural objects, and no surplus lands remained to be reserved. The manifest intent, as appears upon the face of the *titulo*, was to grant to the children of Luis Arguello, deceased, the land described. The confirmation of the grant by the Government of the United States described the land by the same natural objects as those contained in the original concession, but defined with more precision its western boundary as at the eastern borders of the valley known as the Cañada de Raimundo. The words in the final decree following the description by boundaries—"said land being of the extent of four leagues in length and one in breadth, be the same more or less,"—is not a limitation of the quantity confirmed. If it had been intended to limit the quantity to four square leagues of land—in length four leagues and in breadth one—lying adjoining the estuaries, it is to be presumed the Court would have so declared in express terms; but, as if doubtful as to its extent, and to guard against a constructive limitation as to quantity, the words " be the same more or less " seem to have been employed.

The rule is well settled that where land is described in a

deed by permanent objects as its boundaries, and also by courses and distances with a mention of the quantity, the description by courses, distances and quantity must yield to the boundaries if they do not agree. (*Stanley* v. *Green*, 12 Cal. 164, and the cases there cited; 17 Mass. 207; 17 Pick. 357; 19 Pick. 445.) This rule rests upon solid reasons. While there may be a mistake respecting the courses and distances as to the boundaries of a tract of land, or as to the quantity of acres or leagues it contains, there can be none when its extent is defined by permanent natural monuments.

Admitting this construction of the language of the description contained in the original grant of the Las Pulgas and in the decree of confirmation to be correct, the defendants claim that the valley of the Cañada de Raimundo, by fair construction, comprehends the slope of the hills forming its eastern boundary, and that as the western limit of the Las Pulgas was declared to be the Cañada de Raimundo, the line between the two ranchos was at the top of these hills. Whatever force there might be in this position of the defendants, if the eastern line of the Cañada de Raimundo were not already established by Government authority, is overcome in the present state of things, by the fact that the Government, in a proceeding to which the defendants or those under whom they claim, were parties, has determined the eastern boundary of the Cañada de Raimundo to be at the base of the hills on the eastern border of the valley. It does not appear that any objection was made to the Government survey fixing this boundary so as to make it coincide with the western boundary line of the Las Pulgas, as surveyed and patented. If they did so object at the proper time and before the proper authority, their objections did not prevail. The survey of the Cañada de Raimundo was approved and confirmed on the part of the Government, as appears by the patent issued, and this must be regarded as conclusive upon the defendants who were parties or privies to the proceeding, and became bound by this action of the Government.

The views which we entertain and have herein expressed,

render it unnecessary to consider other points made in the case, and which have been ably argued by the counsel of the respective parties. We are of the opinion the judgment should be affirmed.

Judgment affirmed.