[No. 2,346.]

## HENRY MILLER, THOMAS REA, AND JAMES P. SARGENT, *v.* GEORGE W. DALE, AND THIRTY–FOUR OTHERS.

MEXICAN GRANT OF LAND—WHEN INCHOATE.—If an order made by the Mexican Government for a license to occupy land, be treated as a grant of land, it does not make a perfect grant, but only an inchoate title.

IDEM.—If a petition made to the Mexican Government for a concession of land asks for a certain number of leagues, more or less, within boundaries which are indefinine, the concession gives only an inchoate title.

IDEM.—An approval of a Mexican grant of land by the Departmental Assembly, and the giving of juridical possession, are necessary to create a definitive grant.

APPROVAL OF SURVEY OF MEXICAN GRANT.—The approval of a final survey of a Mexican grant of land by the United States Courts, under the Act entitled "an Act to expedite the settlement of titles to lands in the State of California," approved July 1st, 1864, is not equivalent to a patent for the land.

IDEM.—The approval of a final survey of a Mexican grant cannot have the force of a patent unless such effect is given to it by statutory enactment, and the Act of Congress of July 1st, 1864, is silent as to the effect an approval of a survey shall have.

CONFLICT OF SURVEYS OF MEXICAN GRANTS. — Where two imperfect grants of land were made by the Mexican Government, both of which were confirmed by the United States, and their final approved surveys, made under the Act of Congress of July 1st, 1864, lapped over each other, and for one a patent was issued by the United States: *Held*, that the owners of the grant for which no patent had been issued could not recover, from those claiming under the other grant, possession of the land where the surveys conflicted.

THIRD PERSONS AGAINST WHOM SURVEY AND PATENT ARE NOT CONCLUSIVE.—Third persons, within the meaning of the Act of Congress of 1851, against whose interest the final confirmation and patent of a Mexican grant are not conclusive, are those, and those only, who have such claim of title that they could, under the stipulations of the treaty of Guadalupe Hidalgo, and the law of nations, withstand the Government of the United States if it were claiming the land for itself. One claiming under an inchoate Mexican grant which has been confirmed, and the final survey of which has been approved under the Act of July 1st, 1864, is not such third person.

ATTACK ON A PATENT IN A COLLATERAL ACTION.—In ejectment between those claiming under a confirmed Mexican grant for which a patent has been issued, and those claiming under another confirmed grant for which no patent has been issued, the Court cannot inquire whether the confirmation which resulted in the issuing of a patent was obtained by the use of false and fraudulent evidence.

IDEM.—A patent is a record of the Government which cannot be assailed on the ground that it was obtained by false or fraudulent evidence, in a collateral action in which it is used as evidence as a source of title.

APPEAL from the District Court of the Third Judicial District, County of Santa Clara.

The Court below rendered judgment for the defendants, and the plaintiffs appealed.

The other facts are stated in the opinion.

*Thornton & Williams,* and *S. O. Houghton,* for Appellants.

The final confirmation and survey of the Rancho Las Animas is equivalent to a patent.

Where a confirmed claim is located under and pursuant to the provisions of the Act of Congress entitled "An Act to define and regulate the jurisdiction of the District Courts of the United States in California in regard to private land claims," approved June 14th, 1860, the approved survey of such location is equivalent to a patent.

Section five of that Act provides that such survey "shall have the same effect and validity in law as if a patent for the land so surveyed had been issued by the United States."

In the case of *Searle* v. *Ford,* 29 Cal. 106, it was held by this Court that a finally approved survey, under that Act, placed the confirmee of the tract in the same position that he would be in if he had a patent. The appellants, therefore, have the same standing as though a patent had been issued to them. (*Bernal* v. *Lynch,* 36 Cal. 144.)

Appellants are third persons, within the meaning of the fifteenth section of the Act of March 3d, 1851, even though their title was not perfect when the United States acquired California.

The "Act to ascertain and settle private land claims in the State of California," approved March 3d, 1851, prescribes what proceedings shall be had for the recognition and confirmation of claims to land in this State derived from Spain and Mexico, and created a tribunal (Commissioners) before which all persons who claimed land in California, derived from the Spanish or Mexican Governments, were required to present them to have their validity adjudicated, and provided for appeals to the District and Supreme Courts of the United States.

Section fifteen of that Act provides "that the final decrees rendered by the said Commissioners, or by the Dis-

trict or Supreme Court of the United States, or any patent to be issued under this Act, shall be. conclusive between the United States and the said· claimants only, and shall not affect the interests of third persons."

Both this Court and the Supreme Court of the United States have had occasion to construe the language of that section. In the case of *Waterman* v. *Smith*, 13 Cal. 420, this Court said: "The third persons against whose interests, by the fifteenth section of the Act of 1851, the final confirmation and patent are not conclusive, are those whose title is, at the time, such as to enable them to resist successfully any action of the Government in respect to it."

In *Moore* v. *Wilkinson*, 13 Cal. 487, it is said: "Individuals can resist the conclusiveness of the patent only by showing that it conflicts with prior rights vested in them." And the Court cites from *Waterman* v. *Smith*, the definition there given of "third persons," which we have quoted.

In *Teschemaker* v. *Thompson*, 18 Cal. 27, it is said that "the 'third person' against whose interest the action of the Government and patent are not conclusive under the fifteenth section of the Act of March 3d, 1851, are those whose title accrued before the duty of the Government and its rights under the treaty attached."

The Supreme Court of the United States, in the case of *Beard* v. *Federy*, 3 Wal. 493, adopts the definition in *Waterman* v. *Smith*, and says, referring· to section fifteen of the Act of March 3d, 1851: "The term 'third persons,' as there used, does not embrace all persons other than the United States and the claimants, but only those who hold superior titles, such as will enable them to resist successfully any action of the Government in disposing of the property."

This definition of "third persons," in the cases of *Waterman* v. *Smith* and *Beard* v. *Federy*, is not as clear and precise as it might be. The meaning of the language cannot be that "third persons" are only those who have perfect titles

derived from the former Government, for even they cannot resist successfully any action of the Government with respect to their titles.

It cannot be doubted that, if the Government chose to assert its power, it could confiscate all property claimed under grants or otherwise from the Government which it has displaced. Such a proceeding would be a violation of its treaty obligations and of the law of nations, but there can be no question that it possesses the power.

It would seem that the definition of "third persons" given in *Waterman* v. *Smith,* and *Moore* v. *Wilkinson,* by this Court, and by the Supreme Court of the United States in *Beard* v. *Federy,* is entirely too restricted; for the very proof thereby required to make a party a third person would show a title in him superior to any the United States could give.

The definition in *Teschemaker* v. *Thompson* is the most accurate that is found in any of the cases, "third persons" being there held to be "those whose title accrued before the duty of the Government and its rights under the treaty attached."

This language will include all titles, equitable as well as legal.

The Act of March 3d, 1851, provides (section eight) for the presentation for confirmation of all claims for lands in California by virtue of any right or title derived from the Spanish or Mexican Governments; and section eleven provides that the Commissioners provided for in said Act, and the District and Supreme Courts in deciding on the validity of any claim brought before them, shall be governed by the treaty of Guadalupe Hidalgo, the law of nations, the laws, usages, and customs of the Government from which the claim is derived, the principles of equity, and the decisions of the Supreme Court, so far as applicable.

It is clear, from the language of the sections we have referred to, that no distinction is intended to be made by

that Act between legal and equitable titles; that all claimants of property, whether their rights are based on perfect or imperfect titles, are equally protected by its provisions.

It is submitted that "third persons" are all those who at the cession of California were the holders of such titles to land derived from Spain or Mexico as conferred upon them a right of property which the United States was bound to protect and recognize, but that those whose sole right was a mere claim upon the bounty of the Government are not such third persons.

The decree locating Las Animas is conclusive upon the defendants that the premises in controversy are a part of the Rancho Las Animas.

The grantee of respondents was a party to the proceedings had in the Courts of the United States, under the Act of June 14th, 1860, in the matter of the survey and location of Las Animas. In the case of *Rodriguez* v. *The United States,* 1 Wal. 591, it was held that where proceedings were had under the Act of June 14th, 1860, and the claimant of a conflicting tract made himself a party to such proceeding, he is bound by the result. And this Court, in the case of *Treadway* v. *Semple,* 28 Cal. 659, speaking with reference to surveys under the Act of June 14th, 1860, says: "The proceedings had under this Act, after the return of the survey and plot, are strictly judicial in their character. The parties interested have an opportunity to be heard, and those appearing actually are heard, and their rights litigated and adjudicated; and when thus finally determined we see no reason why the matters determined should not, like all other judicial determinations upon points directly in issue, be regarded as *res adjudicata,* and be final and conclusive upon the rights of the parties." (*United States* v. *Estudillo,* 1 Wal. 716; *United States* v. *Halleck,* 1 Wal. 455; *Semple* v. *Wright,* 32 Cal. 667 ; *Bernal* v. *Lynch,* 36 Cal. 143, 144.)

The force and effect of patents issued in pursuance of con-

firmations of Spanish and Mexican claims has been the subject of consideration by this Court in a number of cases; but no case has yet come before it where, as in this case, both parties have patents which cover the same land; and no construction has yet been placed upon the clause in the Act of March 3d, 1851, which limits and controls the effect and operation of the patent issued upon a confirmation under that Act, and its effect and operation determined where a junior patent based upon a prior equity covers the same, or a part of the same land included in a prior patent, based upon a junior equity. In the case of *Moore* v. *Wilkinson*, 13 Cal. 487, it was held that the patent is evidence of the relinquishment to the patentee of all the interest of the United States in the land. In *Yount* v. *Howell*, 14 Cal. 469, it was held that the patent issued upon the confirmation of a Mexican grant is, as against the Government, evidence of the existence and validity of the grant, as well as of the relinquishment of all claim of the United States to the land it embraces. (*Ely* v. *Frisbie*, 17 Cal. 259, and *Leese* v. *Clark*, 20 Cal. 423, and *Stark* v. *Barrett*, 15 Cal. 366, are to the same effect.)

*Lawrence Archer* and *John B. Felton*, for Respondents.

It is contended by the appellants that, on the hypothesis that plaintiffs have a final survey, both parties are equal, so far as the confirmation by the United States is concerned, and that the Court will look behind the patent to see which party has the superior equity.

Will the Court, in a case like this, go behind the patent of the United States? In discussing this question, we assume that both classes of equities in this case were purely of a political character, not of a legal character. That the grants confirmed in both cases were inchoate and imperfect, and that they required further action of the Government to render them perfect titles.

If a grant is inchoate, requiring further steps to be taken before it is perfect, there is no obligation, other than a moral one, on the part of the Government, to go on and complete the title. It is then at the discretion of the granting power whether this shall be done or not.

If a Court of law cannot usurp to itself the political power of going on and confirming an inchoate grant, how can it by its decision, irrespective of the action of the political power, determine that one inchoate grant or political equity is better than another? If this be so, then the Court below could not inquire which of these two sets of equities created the superior political obligation, for that was a matter for the political department alone to decide.

On the hypothesis, then, that plaintiffs have what is equivalent to a patent, and the El Solis claimants have a patent, how shall the Court decide? Both parties are equal in right, but one is in possession. Evidently the party trying to oust another must do so by a superior title. It will not do for the plaintiff to have merely a title equal to ours. He must have the superior title. But we deny that plaintiff, even assuming that he has a final survey, stands on an equal footing with us. He has no political recognition of his title. Something still remains to be done to perfect his title, and that is the political recognition through a patent.

All that has been done in perfecting the title when the final survey issues, is to obtain the judicial sanction, not the political. In *Beard* v. *Federy*, 3 Wallace, 493, Judge Field says: "When informed by the action of its tribunals and officers that a claim asserted is valid and entitled to recognition, the Government acts and issues its patent to the claimant. This instrument is therefore record evidence of the action of the Government upon the title of the claimant." Evidently the law of 1860 does not intend to dispense with

Cal. Reps. XLIV—72

this Government recognition, and consequently, even under that Act, a survey is not equivalent to a patent.

The case stands thus: We have a confirmation, survey, and political recognition; the other side has but the confirmation and survey. Now, as the matter of determining which has the perfect title is for the Government to determine, we have the final determination of the Government in our favor. The appellants have only, to use Judge FIFLD's language, the information given to the Government by its tribunals and officers. On this information the political branch of the Government has not yet acted. We contend, then: First—That assuming plaintiffs to have a final survey, we have as against them the perfect title; that a patent is superior to final survey. Second—That assuming our titles to be equal, we are in possession.

Assuming that the equities in this case are of a political character, and a Court of law cannot pass upon them, we have the superior title.

By the Court, BELCHER, J.:

This is an action of ejectment for a tract of land in Santa Clara County. By their pleadings both the plaintiffs and the defendants claim to be owners of the land in fee. From the record it appears that on the 5th day of July, 1802, by petition of that date, addressed to the Viceroy of Mexico, Mariano Castro, who was then in Mexico, requested permission to settle on a tract of land in the jurisdiction of Monterey, in the Californias, known as La Brea. The Viceroy referred the petition to the Royal Tribunal of Accounts and the Fiscal of the Royal Treasury, who reported favorably, and on the seventeenth of August the Viceroy granted the permission. On his arrival in California Castro solicited possession of the tract from the Commandant at Monterey, and then from the Governor, Arrillaga. The priests of the

Mission of San Juan Bautista opposed his settlement, and so far as appears he never acquired possession of the tract. At some time prior to the 30th of July, 1804, as appears by a letter from Castro, the Viceroy revoked his license for La Brea, and directed him to select another tract of land instead of it. On the 3d of July, 1808, he solicited from the Commandant of Monterey the tract of land known as El Carneadero, and since known as Las Animas. The priests of the mission opposed his settlement upon this tract also, claiming that it, as well as La Brea, was necessary for the support of the mission. Whether this petition was granted or not does not appear from the record. Castro died prior to 1829. On the 21st of June, 1833, his widow, Maria Josefa Romero, in a petition to the Governor, represented that her late husband had taken possession of the tract called Las Animas in 1806, but that she had not the title papers, and she therefore asked that a patent be issued to her to establish her right. On the 20th of June, 1835, Carlos Castro, as attorney for the widow, again petitioned the Governor on her behalf for a revalidation of the title to her, representing that the tract Las Animas had been granted by the Viceroy to Mariano Castro in 1801, that he took possession in 1809, but that his ranch house had been burned up and he had lost all his title deeds. Upon the receipt of this petition the Governor ordered search to be made for the record of the concession. An examination of the records disclosed the existence of seventeen documents relating to the matter, among which were found the petition of Castro to the Viceroy, the reports of the officers to whom it was referred, the order of the Viceroy, and the reports of parties to whom the matter of possession was referred by the Governor, all of which documents are set out in full in the transcript. On the 7th of August, 1835, the Governor made an order of which the following is a copy:

Opinion of the Court—Belcher, J.

"MONTEREY, August 7th, 1835.

"In accordance with the petition of Carlos Castro, attorney for the widow Josefa Romero, as the representative of the will and estate of her departed husband, Mariano Castro, soliciting the revalidation of the titles of fee (titulos de propriedad) to the Rancho Las Animas, which they possess in public notoriety further back than twenty years, in view of the evidence which this expediente affords, by which is accredited the right of Mariano Castro to the tract of Las Animas, granted to him by the Vice Royal Government under the name of Sitios, called de la Brea, according to the patent of the 17th of August, 1802, let a testimonial be issued of this expediente for the protection of the parties. And whereas, the boundaries to which they must confine themselves (the parties in interest) are not expressly defined, those set forth in the plot presented by the attorney, Carlos Castro, shall in future be known as such, leaving uninjured the right of any third party who may consider himself aggrieved by this proceeding."

On the 5th of April, 1852, one Sanchez, who had succeeded to the rights of the widow Romero and her children, presented his petition to the Board of Land Commissioners for the confirmation to him of Las Animas. On the 14th of February, 1854, the Board confirmed his claim, and on the 26th of January, 1859, the claim was finally confirmed by the District Court. A survey of the rancho was made in 1859, which did not include the land in controversy. This survey was returned into the District Court, and in December of that year objections to the survey were filed by the confirmee. In October, 1860, that Court issued its monition requiring all parties in interest to intervene for the protection of their rights, and on the 26th of January, 1864, made an order setting aside the survey and directing a new one to be made. Among the parties who intervened was

John H. Moore, the grantor of defendants, who intervened as a part owner of the Rancho San Ysidro, part of which was embraced in the survey of Las Animas. A new survey was made by the Surveyor General, which was approved by the District Court in June, 1865, and by the Circuit Court, on appeal, in September, 1866. No patent appears yet to have been issued for this claim.

On the part of the defendants, it appears that on the 27th of February, 1831, Macario Castro petitioned the then Governor of California for the privilege of occupying the tract of land called El Solis, and that the Governor on the same day granted his petition. Under this license he entered into the possession of the tract, and the possession was maintained by himself and family till the acquisition of the country by the United States. On the 2d of March, 1853, the widow and children of Macario Castro filed their petition for the confirmation of their claim to the Rancho El Solis, alleging continued occupancy for more than twenty years. On the 4th of December, 1855, the Board of Land Commissioners confirmed the claim, and on the 24th of March, 1857, in was finally confirmed by the District Court. On the 18th of January, 1859, the United States issued its patent for the land to the claimants.

The land in controversy is embraced within the calls of the El Solis patent and of the Las Animas approved survey.

The plaintiffs own the Las Animas title, and the defendants the El Solis title.

Upon these facts we do not think the plaintiffs can maintain their action.

1. It is not claimed that there was a perfect title to the tract known as Las Animas under the Mexican Government, and if such a claim were made, it is manifest that it could not be maintained. Mariano Castro obtained from the Viceroy, in 1802, a license to occupy La Brea, but failing to obtain possession of that tract, he presented a petition to the

Commandant of Monterey for leave to occupy El Carneadero, afterwards called Las Animas. He entered into possession of the last named tract, but the record fails to show that he ever received any grant or license therefor. The order of the Governor of August 7th, 1835, purports only to be a revalidation of former titles, and not a new grant. The titles revalidated which are set out as part of that expediente show only the license to occupy La Brea, and the petition for license to occupy El Carneadero and the fact of actual occupancy of the last named tract. It is doubtful, therefore, if that order had any óther or greater effect than to give to the widow and children of Mariano Castro the license which he sought from the Commandant, but, so far as appears, failed to obtain. But if that order is to be treated as a grant of the land, still it had none of the characteristics of a perfect grant. It created only an imperfect and inchoate title. In the petition, four square leagues, a little more or less, were asked for, but within wholly indefinite and uncertain boundaries. Moreover, it was never approved by the Departmental Assembly, nor was juridical possession of the land given, both of which were necessary to a definitive grant.

2. The plaintiffs' approved survey is not the equivalent of a patent. It could not have the force and effect of a patent, unless such force and effect were given to it by express statutory enactment. The survey of Las Animas was filed June 6th, 1865, and was approved by the District Court June 10th, 1865, and by the Circuit Court, on appeal, September 7th, 1866. All the proceedings for its approval were had under the provisions of the Act of Congress entitled "An Act to expedite the settlement of titles to lands in the State of California," approved July 1st, 1864. This Act repeals the Act of June 14th, 1860, and does not declare that a survey approved by the Courts shall have the effect of a patent. The Act of 1860 provided that the Surveyor General should give notice by publication for four weeks whenever a private land

claim had been surveyed and a plat of the survey made, and that, during that time, the plat should remain in his office subject to inspection. Any party in interest objecting to the survey might apply to the District Court to have the survey brought into Court; and the Court was authorized, in such case, to hear testimony, and upon the hearing to correct and modify the survey, or to set it aside and order a new one to be made. The fifth section of the Act provided that "the plat and survey so finally determined by publication, order, or decree, as the case may be, shall have the same effect and validity in law as if a patent for the land so surveyed had been issued by the United States."

It was held by this Court in *Searle* v. *Ford*, 29 Cal. 106, and in *Bernal* v. *Lynch*, 36 Cal. 144, that this language made all surveys, finally determined under the provisions of the Act, equivalent to patents. If that be its true construction, it is clear that the effect given to the surveys did not depend upon the fact that they were finally determined by the order or decree of the Court, for when so determined they had no other or greater effect than when finally determined by the publication of notice.

In this case we are not called upon to express any opinion upon the construction to be given to this language, for, as we have already seen, the plaintiff's survey was made and approved under the Act of 1864, which is silent as to the character and effect it is to have.

3. At the time of the acquisition of California, the title to the land in controversy was in the Mexican Government, and passed by the treaty to the United States. Neither the claimants of Las Animas nor those of El Solis had more than an equitable claim, for the recognition and confirmation of which they were required to look to the bounty and justice of the new Government. In this condition of the title, the parties presented their respective claims for confirmation to the Board of Land Commissioners, by which they were

allowed and confirmed. Other proceedings were then had, resulting on the part of the claimants of El Solis in a patent, by which the United States passed to them all its title to the land.

This title must prevail, unless the plaintiffs are "third persons" within the meaning of the Act of Congress of 1851, against whose interest the final confirmation and patent of the Government are not conclusive.

The third persons there referred to, and whose rights are saved, are only those who have such claim of title that they could, under the stipulations of the treaty of Guadalupe Hidalgo, and the law of nations, withstand the Government if it were claiming the lands for itself. Their claim of title must be such as addresses itself to the judicial consideration of the Government. They must be in a condition to demand, as a right, and not compelled to ask, as a favor. It has been so expressly held by this Court in many cases. Thus, in *Waterman* v. *Smith*, 13 Cal. 420, FIELD, J., delivering the opinion, it is said: "The third persons against whose interests, by the fifteenth section of the Act of 1851, the final confirmation and patent are not conclusive, are those whose title is at the time such as to enable them to resist successfully any action of the Government in respect to it."

In *Teschemacher* v. *Thompson*, 18 Cal. 27, the same learned Judge said: "The third persons against whose interest the action of the Government and patent are not conclusive, under the fifteenth section of the Act of March 3d, 1851, are those whose title accrued before the duty of the Government and its rights under the treaty attached."

So in *Leese* v. *Clark*, 18 Cal. 572, it is said: "The third persons, within the meaning of the section referred to, who can controvert the location of a grant upon which a patent has issued, are those whose title to the premises patented not only accrued before the duty of the Government and its rights under the treaty attached, but whose title to such

premises was at that date such as to enable them to resist successfully any subsequent action of the Government affecting it."

In *Leese* v. *Clark*, 20 Cal. 425, it is said: "The term 'third person' refers not to all persons other than the United States and the claimants, but to those who hold independent titles arising previous to the acquisition of the country. The latter class are not bound by the decree and patent, for they do not hold in subordination to the Government nor by any title subsequent, but by title arising anterior to the conquest."

In *Minturn* v. *Brower*, 24 Cal. 669, the Court say: "The interests of third persons that remained unaffected by the final confirmation and patent are those subsisting in perfect titles derived from a source of paramount proprietorship, which could be used in resisting successfully any action of the Government respecting them."

In the case of *De Arguello* v. *Greer*, 26 Cal. 627, these cases are cited and approved. The Court there say: "These cases must be regarded as having settled the construction, so far as the Courts of this State are concerned, to be given to this section of the Act of Congress. If Coppinger's heirs and successors in interest have an interest in the land in controversy of a character that could be used in resisting successfully any action of the Government respecting it, then they have a *status* in the case, which entitles them to the relief they have sought, otherwise they are not in a position to complain of the action of the Government, on whose bounty and justice they have depended for the confirmation of their claim to the Cañada de Raimundo."

It is obvious, we think, that the plaintiffs are not "third persons" within the rule laid down in the above cited cases.

4. It is claimed by the appellants, that the confirmation of

the Rancho El Solis, which resulted in the issuing of a patent therefor, was obtained by the introduction and use of certain false and fraudulent evidence. If this be so, it is a matter which cannot be inquired into in this action. The Board of Land Commissioners and the District Court having acquired jurisdiction of the subject matter, the validity of the claim presented, and whether it was entitled to confirmation, were matters for their determination, and their decisions, however erroneous, cannot here be called in question, on the ground that they were rendered upon fraudulent or insufficient evidence. (*Beard* v. *Federy,* 3 Wall. 489; *Bernal* v. *Lynch,* 36 Cal. 143.) It is a matter of no moment, therefore, so far as this case is concerned, whether correct or incorrect translations were used. The patent is a record of the Government, which cannot be assailed in this way. Speaking of a patent, in *Leese* v. *Clark,* 18 Cal. 572, the Court say: "This instrument, as we have stated, is the record of the Government upon the title of the patentee to the land described therein, declaring the validity of that title, and that it rightfully attaches to the land. Upon all the matters of fact and law essential to authorize its issuance it imports absolute verity, and it can only be vacated and set aside by direct proceedings instituted by the Government, or by parties acting in the name and by the authority of the Government. Until thus vacated it is conclusive, not only as between the patentee and the Government, but between parties claiming in privity with either by title subsequent."

Similar language was used by the Supreme Court of the United States in *Beard* v. *Federy, supra.* Mr. Justice FIELD, in delivering the opinion of the Court, said: "When informed by the action of its tribunals and officers that a claim asserted is valid and entitled to recognition, the Government acts and issues its patent to the claimant. This instrument is, therefore, record evidence of the action of the

Government upon the title of the claimant. By it the Government declares that the claim asserted was valid under the laws of Mexico; that it was entitled to recognition and protection by the stipulations of the treaty, and might have been located under the former Government, and is correctly located now so as to embrace the premises as they are surveyed and described. And against the Government this record, so long as it remains unvacated, is conclusive, as it is equally conclusive against parties claiming under the Government, by title subsequent."

Upon the whole case the judgment and order must be affirmed; and it is so ordered.

Mr. Chief Justice WALLACE, being interested in the action, did not participate in the decision.

Mr. Justice CROCKETT dissented.