MARIA DE LA SOLIDAD DE ARGUELLO ET AL. CLAIMANTS AND APPELLANTS, v. THE UNITED STATES. THE UNITED STATES, APPELLANTS, v. MARIA DE LA SOLIDAD DE ARGUELLO ET AL.

The title of the family of Arguello confirmed to the following described tract of land in California, namely, bounded on the south by the Arrogo, or Creek of San Francisquito, on the north by the Creek San Mateo, on the east by the Esteras, or waters of the bay of San Francisco, and on the west by the eastern borders of the valley known as the Cañada de Raimundo.

On the 26th of November, 1835, the governor of California gave an order that the petitioner should have a tract of land without specifying the boundaries, which was done by an order, having the formalities of a definitive title on the 27th. This latter document must govern the case. No good title is shown which can include the valley on the west.

The testimony upon this point examined.

The decree of 1824 and regulations of 1828 forbid the colonization of territory comprehended within twenty leagues of the boundaries of any foreign state, and within ten leagues of the seacoast, without the consent of the supreme executive power.

But this restriction only included grants to empresarios, who intended to introduce large colonies of foreigners. It did not prohibit grants of land within those limits to natives of the country.

THESE were appeals from the district court of the United States for the northern district of California.

The facts are stated in the opinion of the court.

They were argued by *Mr. Jones*, with whom were *Mr. Benton* and *Mr. Strode*, for the claimants, and by *Mr. Gillett*, for the United States, upon which side there was also a brief filed by *Mr. Cushing*, (attorney-general.)

· Mr. Justice GRIER delivered the opinion of the court.

The claimants in this case presented their petition to the commissioners for settling private land claims in California, praying to have their title confirmed " to a certain tract of land called the ' Rancho de las Pulgas.'" They allege that this tract contains twelve square leagues of land, having a front on the bay of San Francisco of four leagues, bounded southerly by a creek called San Francisquito, and northerly by the San Mateo, and extending back from the bay some three leagues to the sierra, or range of mountains, so as to include the valley, or Cañada de Raymundo.

· The commissioners confirmed the claim to the extent of four leagues in length between said creeks, and one league in breadth, excluding the valley Raymundo, and bounded. by it on the west. This decision of the commissoners was confirmed by the district court, and both parties have appealed to this court.

: We shall first consider the appeal of the claimants.

Have they shown a title to more than the four leagues confirmed to them by the commissioners and the court below?

. The appellants represent the heirs of Don Luis Arguello, who died about the year 1830.

1. They allege that Don José Dario Arguello, father of Don Luis, being one of the founders of the country, and in its military service as commandanté of the Presideo at San Francisco, was the owner of a tract called " Las Pulgas," by virtue of some title or license derived from Don Diego Borica, then governor of the province, who was in possession of it as early as 1795; that this early title has been lost, and remains only in tradition.

2. That, in 1820 or 1821, Don Pablo Vincenté de Sola made a new title to Don Luis Arguello, who had succeeded his father, Don José, in the possession.

3. That after the death of Don Luis, in 1830, his family remained in possession; that in August, 1835, one Alvisu petitioned the governor for a grant of the " Cañada de Raymundo," and, it being found that the heirs of Arguello claimed that valley to be within the bounds of their rancho Pulgas, notice was ordered to be given to the widow and heirs, of Alvisu's petition. That they appeared by their attorney, Estrada, before the governor, and protested against the grant to Alvisu; and that the governor, on inquiry, acknowledged the justice of the claim of the Arguello, and refused to grant the valley to Alvisu.

Arguello et al. *v.* The United States.

4. That in October, 1835, Estrada, the executor of Luis Arguello, and acting as agent for the family, made application to the governor, setting forth their long possession and praying a corresponding title to be issued in their names; and that the governor, after examining into the justice of their claim, issued a decree of concession dated 26th of November, 1835, which was approved by the territorial assembly on the 10th of December following.

This last-mentioned decree or grant thus approved is the only documentary evidence of title exhibited by the claimants. If it includes within its boundaries the " Cañada de Raymundo," as part of " Las Pulgas," it will follow that the claimants have shown a complete title thereto; and our inquiry would end here. Therefore, though last in order in the claimants' deraignment of their title, we shall consider it first.

On the 27th of October, 1835, Don Jose Estrada, executor of Don Luis Arguello, presented his petition on behalf of the widow and heirs, to Don Jose Castro, the governor, praying for a grant of the " rancho of Las Pulgas," and describing its boundaries as " from the Creek of San Matteo to the Creek of San Francesquito, and from the Estheros, (the estuary or bay,) to the Sierra, or mountains." The petition alleged also that the Arguellos had " been in possession of the same since 1800, as is publicly and notoriously known, but the papers of possession had been mislaid."

The rough draft (diseno) accompanying this petition represents a range of hills designated as " Lomeria baja," and parallel to these a range of loftier character marked " Sierra;" between these ranges is a cañada, or valley; this is the Valley Raymundo. The claim of the petition is evidently intended to include it.

On the 26th of October, 1835, the governor made the usual order requiring the alcaldé of San Francisco de Assiz to take information as to the land, and make return of the expediente. The alcaldé made a report, accompanied by the testimony of three witnesses, who proved an occupancy of the rancho of Las Pulgas by the Arguellos for many years as a cattle range. One describes it as extending from east to west (evidently a mistake for north to south) four leagues, and from the estuary to the hills (lomas) situate at the west of Monte Redondo and Cañada " Raymundo." This would include the valley now claimed. But the second witness describes it as " about four leagues " from creek to creek, and " one league " from the estuary to the mountains covered with trees." The third as " four leagues from creek to creek and one league from the estuary to the mountains covered with trees, of the Cañada Raymundo."

. The petitioner did not exhibit any documentary evidence of a prior grant of any given quantity of land, or setting forth any certain boundary, nor did the witnesses pretend to have ever seen any.

When the report was returned to the governor, he made the following order, dated 26th November, 1835 :—

"Monterey, November 26, 1835.

" In view of the petition with which this espediente begins, and the information of three competent witnesses, and in conformity with the laws and regulations of the subject, the minor orphans of the deceased citizen, Don Louis Arguello, at the petition of Jose Estrada, citizen, are declared the owners in property of the tract known under the name of ' Las Pulgas;' reserving the approval of the M. E. territorial deputation, to which this espediente shall be sent, the corresponding patent to be signed, and recorded in the corresponding book, delivering it to the interested parties for its suitable uses. Senor Don Jose Castro, senior member (vocal) of the M. E. territorial deputation, and political chief, *ad interim,* of Upper California, thus ordered, decreed, and signed; to which I certify."

On the next day (27th of November, 1835,) the governor executed the following document to serve as a title or letters-patent. It is signed by the governor and secretary, and recorded in the archives.

" Whereas, citizen Jose Estrada has petitioned in the name of his wards, Jose Ramon and Luis Arguello, and the girls M'a Concepcion and M'a Josefa, minors and legitimate children of the deceased citizen, Luis Arguello, having previously taken the deposition of proper witnesses, and they having declared the land called ' Las Pulgas' to have been their property of the deceased ever since the year of 1800, whereof the limits are on the south, the Arrogo of San Francisquito, on the north, that of San Matteo, on the east the estuaries, and on the west the Cañada de Raimundo; and using the faculties which are conferred on me by decree of this day, and in the name of the Mexican nation, I have come to declare him the owner thereof by the present letters, this grant being understood as made in entire conformity with the disposition of the laws with the reservation of the approval of the most excellent territorial deputation. The land herein mentioned is four leagues in latitude and one in longitude. In consequence, I order that the present, serving as a title to him, and to be held as firm and valid, be recorded in the book thereto corresponding, and be delivered to the petitioner for his security and other purposes."

The claimants rely upon the first document, dated November

26, which gives no definite boundary or quantity; and argue that, the grant being thus approved by the assembly, the power of the governor over it ceased, and, consequently, that the document, dated on the 27th, which defines the boundaries and quantity of the concession, is not the definitive grant described in the rules and regulations of 1828. But a glance at these rules and at the contents of these documents will show the fallacy of this assumption.

The first section of these regulations gives the authority to governors (*gefé politico*) to grant vacant lands. The second directs the form and manner in which those who solicit such grant shall address the governor. The third requires the governor to obtain the necessary information required by the laws of 1824, and consult the municipal authorities, whether there are any objections to making such concession. By the 4th section, the governor being thus informed may "accede or not" to the prayer of the petition. This was done in two ways—sometimes he expressed his consent by merely writing the word "concedo" at the bottom of the expediente; at other times it was expressed with more formality, as in the present case. But it seldom specified the boundaries, extent, or conditions of the grant. It is intended merely to show that the governor has "acceded" to the request of the applicant, and as an order for a patent or definitive title in due form to be drawn out for execution. It is not itself such a document as is required by the 8th section, which directs "that the definitive grant asked for being made, a document signed by the governor shall be given to serve as a title to the parties interested."

The document of the 26th has none of the characteristics of a definitive grant. It shows only that the governor assents that the petitioner shall have a grant of a tract of land called "Las Pulgas." It describes no boundary, and ascertains no quantity. It contemplates a "corresponding patent," and does not purport itself to be such document.

On the contrary, the document of the 27th has all the formalities of a definitive title, and purports on its face to be made for that purpose. It gives the boundaries of the tract known as "Las Pulgas," namely: "On the south the creek San Francisquito; on the north the San Matteo; on the east the estuary, on the west the Cañada de Raimundo, four leagues in length and one in breadth."

The Mexican authorities have themselves given a construction to this grant in 1840, when they granted the Cañada de Raimundo to Coppinger, calling for "Las Pulgas" as its eastern boundary. Moreover, juridical possession was given to the Arguellos, establishing the western boundary of the

Las Pulgas, one league west of the estuary or bay of San Francisco.

The commissioners and the court below having confirmed the claim of the appellants to the extent of this legal title, the question on their appeal is, whether they have shown any title to the valley of Raimundo, or for any land west of the boundary adjudged to Las Pulgas by the Mexican authorities, so many years ago. In support of their claim the appellants rely upon a supposed grant from Governor Borrica to Don Jose Arguello, at an early day, and a regrant or new title to Don Luis Arguello in 1820 or 1821, by De Sola.

Much parol testimony, and some historical documents, have been introduced on this subject. The value and effect of this evidence has been very fully discussed by the commissioners and the court below. We fully concur in their conclusions on this subject, but do not think it necessary to indicate our opinion by a special and particular examination of it. It will be sufficient to state the results at which we arrived after a careful consideration.

1. There is no sufficient evidence to satisfy our minds. that any grant was ever made by Governor Borrica, or by De Sola. The archives of government show no trace of evidence of such a grant from either of them. They have not proved the existence of it by the testimony of any one who had seen it; they assume the existence and loss of the documents, from the fact that none can now be found.

Without stopping to inquire, whether, by the Spanish law, a subject could claim against the king by prescription, we will assume, for the purposes of this case, that as a presumption of fact, the court would be justified in presuming a grant on proof of fifty years continuous, notorious, adverse possession of a tract of land having certain admitted and well defined boundaries; and inquire whether we have such evidence as regards this valley of Raimundo, and the eight additional leagues of land now claimed to belong to the ranches of Las Pulgas.

Don Jose Arguello was, for many years, commandant of the Presidio of San Francisco; after his death he was succeeded in the command by his son Don Luis. As early as 1797, the king's horses were pastured and herded on this rancho. As early as 1804 soldiers, under the command of Don Jose, resided in huts on the land included in the grant made to appellants in 1835, and had charge of cattle said to belong to the commandant Don Jose. The sheep of the neighboring mission of Santa Clara were sometimes pastured on it. The king's cattle, as well as those of the commandant, were pastured on it as late as 1821. After the death of Don Jose, his son and successor in office,

Don Luis, continued the occupation of it, by his herds and herdsmen. The cattle on this rancho, at some seasons, wandered over the valley of Raimundo, and to the foot of the western sierra. Don Luis also cut timber at one time on the hills west of said valley.

About 1821, Governor Sola had the king's cattle removed, and permitted Don Luis to remain in possession of the rancho, which he continued to claim as his own up to the time of his death; though he took no steps towards obtaining a definitive title. As to the extent of his claim; his eastern, northern, and southern boundaries by the creek and the estuary, were well known and ascertained. The western, though said to be the hills, or mountains, and, in one sense, a fixed boundary, was very uncertain. It might be at one league from the bay to the first range of woody hills, or four leagues to the highest summit of the main ridge of the sierra. Not one of the witnesses who attempt to establish this title by tradition can state what number of square leagues it contained.

No inference of an adverse claim or grant can be drawn from the fact that the commandant of a post pastured his own cattle with those of the king, or that the son and successor in office should continue in possession of the rancho by permission of the governor after the king's cattle were removed. The fact that the cattle of Arguello wandered to the mountains and over this valley afford no necessary presumption that he claimed it or owned it. And in a frontier country the cutting of timber is very equivocal evidence of even a claim of ownership of the land. The evidence shows also an unequivocal denial of Don Luis that his claim extended beyond the bounds of the grant since made to his heirs, or included the Cañada Raymundo.

The fact that the governor, in 1835, refused to grant this valley to Alvisu, because it belonged or was claimed by the heirs of Arguello, cannot operate to give a title to them by way of estoppel. The only inferences that can be drawn from these proceedings are: 1. That Alvisu applied for the land. 2. That the Arguellos claimed it. 3. That the governor refused, for that reason, to grant it to Alvisu. It has always been the wise and just policy of the Mexican government to avoid granting litigious titles. Hence the caution shown in refusing to grant to Alvisu till the true extent of the Arguello claim was established. Estrada, who acted on that occasion for the widow and heirs, reserved to himself the right " to further develop their claim." This was immediately done by his application to the governor for a title, and the proceedings thereon in 1835, which have been already noticed. This proceeding was instituted for the purpose of having a direct adjudication

46 *

on the claim of the Arguellos, and the extent and boundaries of Las Pulgas, which they then occupied as a rancho. Here we have the first proceeding which can operate as an estoppel on either party. The king may be estopped by his deed, and the appellants by accepting as a definitive title to the Las Pulgas a deed excluding the valley of Raymundo, are estopped from asserting that it is included in their grant. Here, for the first time, we have a juridical investigation to ascertain and fix the boundaries of Las Pulgas. A name which represented heretofore an unknown quantity has been reduced to certainty. This grant has been registered among the public archives, accepted by the claimants, and possession delivered accordingly. Having thus, by a regular juridical proceeding, ascertained the boundaries and quantity of land represented by the name of Las Pulgas, the valley of Raymundo being without the boundary so fixed, is, in 1840, granted as public land to Coppinger.

There is no evidence to show either fraud or mistake in these proceedings. The appellants have got Las Pulgas by a valid title, according to the boundaries ascertained by the proper public authorities, and cannot now be permitted to recur to vague tradition of a vague and uncertain boundary, to unsettle the titles to a large territory since granted to others.

The case of the United States v. Roselius, 15 How. 31, bears a strong resemblance to the present. There it was decided, that, "when a part of the land claimed under a Spanish title was granted to and accepted by the claimant, without any saving of his claim, this must be taken to have satisfied his whole claim upon the equity of the government." It is, say the court, in the nature of a compromise, and conclusive as to the rights of the claimant.

In the case before us, the equity of the claimant was adjudicated after an investigation of the claim, and an ascertainment of its boundary and quantity. But, whether it be treated as *res judicata* or as a compromise, it is equally conclusive as to the claims of the appellant on the equity of the government.

2. We come now to the consideration of the appeal entered on behalf of the United States.

The authenticity of the patent or concession to the claimants for Las Pulgas, in 1835, is not disputed; but it is contended that it is void, "because, under the regulations of 1824, lands lying within the littoral leagues could not be granted by territorial governors, but only by the supreme government."

On the contrary, it is contended by the counsel for the claimants, "that this clause in the colonization laws is not intended as a general prohibition of grants of land within those boundaries, but refers only to foreign colonization; and is applicable to States only, and not to the territories of the republic."

It is evident from an inspection of this act of 1824, and consequent regulations of 1828, that they contemplate two distinct species of grants.　1. Grants to *impresarios*, ·or contractors, sometimes called *pobladores*, who engaged to introduce a body of foreign settlers.　2. The distribution of lands to Mexican citizens, "families or single persons."

While these countries were under the dominion of Spain, the governors had authority to make grants of the latter description, while those of the former required the sanction of the king. ᐧ As examples of such colonization contracts in Louisiana, those of the Marquis of Maison Rouge and the Baron de Bastrop may be referred to.　They came under the consideration of this court in the cases of the United States *v.* King and Coxe, 7· How. 833, and the United States *v.* Philadelphia, 11 How. 609. These contracts were executory.　They designated a certain tract of country, which was "appropriated" to be gratuitously distributed among the colonists, but did not confer an absolute or immediate title to the whole tract to be colonized by the contractor.　"As the object of these grants was to obtain a body of foreign agriculturists,·who would settle together under᛫ one common leader, in whom the government could confide, liberal terms were offered.　A body of such colonists, besides opening, cultivating, and improving, the wild lands, served as a protection against the Indians, and created inducements to others of their countrymen to join them, and thus promote the early settlement of the province."

The same policy was pursued by the Mexican government. Besides the desire of fortifying themselves against apprehended attempts at subjugation by Spain, they had before their eyes the prosperous growth of the United States consequent on the liberal encouragement of European immigration.　But, while · anxious to encourage immigration of foreigners, they nevertheless entertained some jealousy, well founded, perhaps, that in case of conflict with a powerful neighbor, their sympathies and allegiance might not be safely relied on.

Hence, the caution exhibited in requiring the approval of the supreme government "to grants made to impresarios for them to "colonize with many families."　But while a judicious policy might forbid the settlement of large bodies of foreigners on the boundaries and sea-coast, we cannot impute to them the weakness, or folly, of confining their native citizens to the interior, and thus leaving their· sea-coast a wilderness without population.　On the contrary, the·same considerations of policy which excluded foreigners, would encourage the settlement of natives within those·bounds.　The statute books of Mexico abound in acts offering every inducement to Mexican families to settle·on

the frontiers; proffering gratuitous grants of land and of agricultural implements—expenses of their voyage—maintenance for a year—and leave to import certain articles free of duty. The military posts in the territory were on the sea-coast; and it would be strange policy indeed which would isolate the posts intended for the protection of settlers, and compel them to dwell among the savages without protection. Numerous enactments, also, exhibit their cautious jealousy with respect to foreigners, and especially their coterminous neighbors on the north. An act. of 1828 directs all Spaniards living on the coast of the Mexican gulf to retire twenty leagues from it. Another, of. 1830, prohibits settlements of foreigners from coterminous nations on any part of their border states.

A careful examination of this decree of 1824, and regulations of 1828, will show that their letter conforms to this policy, pursued with so much solicitude. The title to the decree shows its subject to be " colonization." The term colonization implies immigration in numbers. The first section speaks of the subjects of such colonization as " foreigners." It guarantees to them security of person and property. The second and third describe the lands open to such colonists, and requires the states to make rules and regulations for colonization within their limits. The fourth (whose construction is now under consideration) forbids the colonization of the territory comprehended within twenty leagues of the boundaries of any foreign state, and within ten leagues of the sea-coast, without the consent of the supreme executive power. The sixth section provides that no duties shall be imposed on the entrance of " foreigners." The seventh forbids the immigration of " foreigners " to be prohibited prior to 1840, except of some particular nation, and under peculiar circumstances. The seventh indicates the possibility that the government may find it necessary to take measures of precaution for the security of the federation with respect to foreigners who come to colonize.

These are all the sections of the act which refer directly to · colonization. The subjects of it are called "foreigners" throughout. They are the only persons to whom the fourth section has any reference or application.

The 9th section first speaks of the " distribution of lands" to individuals and families, as distinguished from colonists, and provides that Mexican citizens should be preferred, without distinction of classes, except as to those who have rendered special service to their country. ·

Thus we have seen that the first eight sections apply wholly to colonists and foreigners. It would be contrary to every canon of construction ·to apply the provisions made for them to the

subject introduced for the first time in the 9th section, or to select the 4th section as applicable to native citizens, while the other seven are confined by their terms to "foreigners."

The regulations of 1828, made for the purpose of carrying into execution the law of 1824, evidently give this construction to that act. It makes a clear distinction between *empresario* contracts for colonization, and grants to Mexican citizens. In conformity with the 4th section of that act, it requires grants to *empresarios* to have the sanction of the supreme government, while those made to individuals or families, need only the approval of the territorial deputation. This may be said to be a legislative construction of the act of 1824, and demonstrates that this restraint of grants within the lateral leagues, had no application except to colonies of foreigners.

If any thing further were wanted to fortify this construction, the uniform practice of the territorial governors to make grants to individuals and families within those bounds would be conclusive.

The petition of Jimeno in 1840, praying the governor to apply to the supreme government for a confirmation of these grants, confirms the views we have taken. It shows what had been the antecedent practice on the subject, and that, although Jimeno had doubts about its legality, others had not.

On the whole, we are of opinion that the judgment of the district court is correct, and it is adjudged that the said claim of the petitioners is valid as to that portion of the land described in the petition, which is bounded as follows, to wit: On the south by the Arroyo, or creek of San Francisquito, he on tnorth by the creek San Matteo, on the east by the Esteras, or waters of the bay of San Francisco, and on the west by the eastern borders of the valley known as the "Cañada de Raimundo," said land being of the extent of four leagues in length and one in breadth, be the same more or less, and it is therefore hereby decreed that the said land be, and the same is hereby confirmed to them; and it is further adjudged and decreed that the said petitioners have and hold the same under this confirmation in the following shares or proportions, to wit: Maria de la Solidad Ortega Arguello, one equal undivided half thereof; Jose Ramon Arguello, one equal undivided fourth part thereof; Luis Antonio Arguello, one equal undivided tenth part thereof; and S. M. Mezes three equal undivided twentieth parts of said premises.

And as to the portion of the premises described in said petition, which is not included within the boundaries above mentioned, the claim of the petitioners is adjudged not to be valid.

No. 77. ARGUELLO et al. *v.* THE UNITED STATES.
No. 78. THE UNITED STATES *v.* ARGUELLO et al.
No. 92. THE UNITED STATES *v.* CERVANTES.
No. 94. THE UNITED STATES *v.* VACA AND PENA.
No. 99. THE UNITED STATES *v.* LARKIN AND MISSROON.

Mr. Justice DANIEL, dissenting.

From the decision of the court in each of these causes, (as I have done in that of the United States *v.* Reading, during the present term, and as I should have done in those of The United States *v.* Ritchie, 17 How. 525, and of The United States, *v.* Fremont, 17 Ib. 542, had I set in the causes last mentioned,) I am constrained to declare my dissent.

The decisions in all the causes above enumerated have, according to my apprehension, been made in violation of the acknowledged laws and authority of that government which should have controlled those decisions and the subjects to which they relate; are subversive alike of justice and of the rights and the policy of the United States in the distribution and seating of the public lands—of the welfare of the people of, California, by inciting and pampering a corrupt and grasping spirit of speculation and monopoly—subversive, likewise, of rules and principles of adjudication heretofore asserted by this court in relation to claims to lands within the acquired domain of the United States.

It has by this court been repeatedly and expressly ruled, with respect to the territories acquired by the United States, either by purchase or conquest, that the laws and institutions in force within those territories at the time of the acquisition, were not from thence to be regarded as foreign laws, and in that aspect to be proved as matters of fact, but that the courts of the United States were authorized and bound to take the same judicial cognizance and notice of these laws which they were authorized and bound to extend to the laws of the several States. This doctrine has been ruled after much consideration and reconsideration, as will be seen in the cases of The United States *v.* King and Coxe, 7 How. 833; The United States *v.* The cities of Philadelphia and New Orleans, 11 Ib. 609; and The United States *v.* Turner et al. 11 Ib. 663.

It is conceded that at the times at which the claims now sanctioned by this court came into being, and from a period anterior to the origin of those claims, down to the transfer of the country to the United States, there existed laws and regulations enacted by the Mexican government with respect to the granting of lands within the republic, prescribing the modes in which, and the agents by whom, all grants should be made, and

prescribing also the limitations and exceptions to which the power of making grants was subjected.

Amongst the laws and ordinances here referred to, are those by which the authority of the provincial commanders or governors to originate the titles to lands was conferred and limited. The prerequisites indispensable for the consummation of titles —the immunity from the power of the provincial governors, or from grants or alienations by them, of lands belonging to the Missions; the prohibition of colonization and settlement within twenty leagues of a foreign territory, and within what have been denominated the littoral leagues, or ten leagues from the sea-coast; and the necessity for a sanction by the departmental assemblies to give validity to private or individual titles, were all, by the same system or body of laws, established and proclaimed.

With the wisdom or justice of those laws and ordinances, it is conceived that this court can have no legitimate concernment; much less can it exercise the power to dispense with them, or to modify them in any degree whatsoever. Its province and its duty are confined to inquiries as to the existence of such laws, and to their just effect upon the pretensions of claimants necessarily dependent upon and subordinate to those laws; and to the protection of the United States, the successors and possessors of that authority by which those laws were ordained.

Whenever these inquiries shall lead to the conclusion that such pretensions are unfounded in law, the right to the subjects to which they relate devolves necessarily upon the United States as succeeding to the sovereignty of the Mexican government; succeeding, also, to the high obligation of so disposing of these subjects as shall render them conducive to the national revenue; shall baffle and defeat the schemes of corrupt and corrupting avarice and monopoly; and shall maintain and secure an equality of privilege and benefit to all the citizens of the nation.

That the laws and ordinances above referred to were solemnly, formally, and legitimately established and proclaimed by the government of Mexico, is not denied, nor is it pretended that they have ever been expressly or openly repealed by the government of the republic. An attempt is made, however, to escape from the authority and effect of those public laws by setting up a practice in violation of them, and, from the proof of this practice, to establish a different code or system by which the former, regularly adopted and promulged, and never directly repealed, has been abrogated and disannulled. The results of this attempt, if successful, (and by this court it has been thus far rendered successful,) are these—that the laws and institu-

tions of the republic of Mexico, inscribed in her archives, are not to be received and judicially noticed by this court; but they are to be sought for in the existence of machinations and abuses which have at different times obtained, in defiance of the established or regular government—proofs to be collected from sources however impure or liable to improper influences;—in other words, the laws of Mexico are to be extracted from statements varying or contradictory as they may be, and resting on the mere assertion of individuals, all of them perhaps interested.

How a proceeding like this is to be reconciled with the decisions of this court already cited, or how indeed it can be reconciled with uniformity or with the safety either of property or person, passes my comprehension to conceive. It can hardly admit of a rational doubt in the mind of any man who considers the character of much of the population of the late Spanish dominions in America—sunk in ignorance, and marked by the traits which tyranny and degradation, political and moral, naturally and usually engender—that proofs, or rather statements, might be obtained, as to any fact or circumstance which it might be deemed desirable or profitable to establish. And it will very probably be developed in the progress of the struggle or scramble for monopoly of the public domain, that many of the witnesses upon whose testimony the novel and sturdy Mexican code of practice or seizure is to be established, in abrogation of the written law, are directly or intermediately interested in the success of a monopoly by which, under the countenance of this court, PRINCIPALITIES are won by AN AFFIDAVIT, and conferred upon the unscrupulous few, to the exclusion and detriment of the many, and by the sacrifice of the sovereign rights of the United States.

A transient view of the circumstances under which these enormous pretensions have been originated, is sufficient, if not for their absolute condemnation, at least, to subject them to a most vigilant scrutiny.

If we look at the condition of the country at the time, we find it in a state of almost incessant agitation, disorder, and revolution—controlled in rapid succession by men either themselves directly and violently seizing upon power, or becoming the instruments of those who had practised such irregularities —men whose position was created or maintained by no regular or constitutional authority, but simply by force, and continuing only until overthrown by superior violence. Turning our attention next to the grants themselves, they are, without an exception, —deficient in the requisites prescribed by the established written laws of the country, as indispensable to impart to them validity—but rest solely upon the circumstances (and boldly

challenging countenance and support here upon those circumstances) that they have originated in practical and temporary usurpations of power; and that, amidst scenes of violence and disorder, have been either maintained or acquiesced in, in defiance of the known public law.

Yet, these avowals with respect to the origin and growth of these claims—avowals which infect and taint their entire being and character, and which ought to consign them to the sternest reprobation—constitute the merits by which they commend themselves to the countenance and support of a tribunal whose highest function is the assertion of law, justice, integrity, order, —the dispensation of right equally to all.

Upon such a foundation, such a pretence, or rather such a defiance of authority, I will not, by an abuse of language, call it even a pretence of right. I cannot consent to impair or destroy the sovereign rights and the financial interests of the United States in the public domain. I can perceive no merit, no claim whatsoever, to favor, on the part of the grasping and unscrupulous speculator and monopolist; no propriety in retarding, for his advantage or profit, the settlement and population of new States, by excluding therefrom the honest citizen of small means, by whose presence and industry the improvement and wealth, and social and moral health, and advancement of the country are always sure to be promoted.