### UNITED STATES v. CORONADO BEACH CO.

(District Court, S. D. California, S. D.   December 29, 1919.)

No. E-34.

**Public lands** ⊂⟹223 (1)—**Mexican grant in California held to convey fee.**

Articles 4 and 5 of the Mexican decree of August 18, 1824, concerning colonization and settlement of national lands, providing that lands within 10 leagues of the sea could not be colonized without the previous approval of the supreme general executive power, and reserving to the federal government the right to take any of such lands for public purposes, apply only to foreign colonization, and not to grants to Mexican citizens, and a grant of an island on the coast of California in May, 1846, to a Mexican citizen, afterward confirmed by the District Court of the United States under Act March 3, 1851, and patented to the successors in interest of the Mexican grantee, *held* to convey title in fee as against the United States, free from any claim to government use.

In Equity. Suit by the United States against the Coronado Beach Company, for condemnation of land. Decree awarding compensation to defendant.

Decree affirmed 255 U. S. ——, 41 Sup. Ct. 378, 65 L. Ed. ——.

A. Mitchell Palmer, Atty. Gen., Geo. J. Denis, Sp. Asst. Atty. Gen., of Los Angeles, Cal., and Robert O'Connor, U. S. Atty., of Los Angeles, Cal.

Morrison, Dunne & Brobeck, of San Francisco, Cal., for defendant.

TRIPPET, District Judge. This suit is being prosecuted in pursuance of an act of Congress of date July 27, 1917 (40 Stat. 247 [Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 1867ddd]). This act provides that the suit shall be prosecuted in accordance with the laws of the state of California relating to the condemnation of property for public use. The suit is for the determination and appraisement of any rights the defendant may have in North Island, in the harbor of San Diego, Cal., and for the condemnation of such rights. The government took possession of this island, and now seeks to condemn the defendant's interest therein, under the above-mentioned act, for use for national defense and in connection therewith as sites for permanent aviation stations for the army and navy and for aviation school purposes.

On August 18, 1824, the sovereign general constituent congress of the United Mexican states issued a decree concerning colonization and settlement of the national lands of said republic. This decree provides:

Art. 4. That those territories within ten leagues of the sea coast cannot be colonized "without the previous approval of the supreme general executive power."

Art. 5. "If for the defense or security of the nation the federal government should find it expedient to make use of any portion of these lands for the purpose of constructing warehouses, arsenals, or other public edifices, it may do so, with the approbation of the general congress," etc.

Art. 16. That the government, in conformity with the principles established in this law, will proceed to the colonization of the territories of the republic.

On November 21, 1828, in pursuance of article 15, the government, through his excellency, issued rules and regulations for the colonization of the territories of the republic. The Mexican government granted the land in controversy to one Pedro Carrillo, a Mexican citizen, on May 15, 1846. This grant was made by Pio Pico, the Governor of California, and recites:

"Whereas, Don Pedro Carrillo has, for his personal benefit and that of his family, petitioned for the land known as the island or peninsula in the port of San Diego, the proper examinations being previously made, using the faculties which are conferred on me in the name of the Mexican nation, I have granted him the aforesaid land in decree of this day, declaring to him the ownership of it by these presents, in conformity with the law of August 18, 1824, and the regulations of November 21, 1828, subject to the approval of the most excellent departmental assembly, and under the following conditions," etc.

This recitation was made in the grant to comply with article 8 of the rules and regulations of November 21, 1828. It does not appear in the record that the grant was made with the approval of the supreme general executive power, as provided by article 4 of the decree of August 18, 1824. By virtue of the treaty of Guadalupe Hidalgo (9 Stat. 922), Congress on March 3, 1851 (9 Stat. 631, c. 41), enacted a law entitled "An act to ascertain and settle the private land claims in the state of California." Pursuant to this act of Congress, Billings and others, assignees of Carrillo, the Mexican grantee, instituted proceedings against the United States before the commissioners created by said act, and subsequently in the District Court of the United States, to have the said title confirmed to them. The board of commissioners rejected the claim of Billings and others, but the District Court confirmed it on the 12th day of January, 1857. The only parties to said suit were Billings and others, as plaintiffs, and the United States, as defendant. However, before a patent was issued by the United States for the land, other parties were substituted for Billings and others. The patent issued to the successors of Carrillo makes the following recitation:

"Now know ye: That the United States of America in consideration of the premises and pursuant to the provisions of the act of Congress aforesaid of 3d March 1851, and the legislation supplemental thereto, have given and granted and by these presents do give and grant unto the said Archibald C. Peachy and William H. Aspinwall, and their heirs, the tract of land embraced and described in the foregoing survey, but with the stipulation that, in virtue of the fifteenth section of the said act, the confirmation of the said claim and this 'patent' shall not affect the interest of third persons."

"To have and to hold the said tract, with the appurtenances, unto the said Archibald C. Peachy and William H. Aspinwall and to their heirs and assigns forever, with the stipulation aforesaid."

The title acquired under this patent passed to the defendant. The plaintiff claims that the grant to Carrillo created a fee in the grantee, subject to the reservation provided in article 5 of the act of August 18, 1824, above quoted, and claims that the patent was simply a confirmation of such title, and that the right reserved to the Mexican government passed to the United States by virtue of the treaty of Guadalupe Hidalgo.

On the contrary, counsel for the defendant contends that the grant to Carrillo passed a fee-simple title, and claims that the first eight articles of the decree of 1824 referred only to foreign colonization, and not to grants made to citizens of Mexico, and is applicable only to estates, and not to the territories of the republic.

In De Arguello v. U. S., 18 How. 539, 15 L. Ed. 478, at the December term, 1855, the Supreme Court, in discussing this question, used the following language:

"It is evident from an inspection of this act of 1824, and consequent regulations of 1828, that they contemplate two distinct species of grants: (1) Grants to impresarios, or contractors, sometimes called pobladores, who engaged to introduce a body of foreign settlers. (2) The distribution of lands to Mexican citizens, 'families or single persons.'

"While these countries were under the dominion of Spain, the governors had authority to make grants of the latter description, while those of the former required the sanction of the king. As examples of such colonization contracts in Louisiana, those of the Marquis of Maison Rouge and the Baron de Bastrop may be referred to. They came under the consideration of this court in the cases of United States v. King and Coxe, 7 How. 833, and United States v. Philadelphia, 11 How. 609. These contracts were executory. They designated a certain tract of country, which was 'appropriated' to be gratuitously distributed among the colonists, but did not confer an absolute or immediate title to the whole tract to be colonized by the contractor. 'As the object of these grants was to obtain a body of foreign agriculturists, who would settle together under one common leader, in whom the government could confide, liberal terms were offered. A body of such colonists, besides opening, cultivating, improving, the wild lands, served as a protection against the Indians, and created inducements to others of their countrymen to join them, and thus promote the early settlement of the province.'

"The same policy was pursued by the Mexican government. Besides the desire of fortifying themselves against apprehended attempts at subjugation by Spain, they had before their eyes the prosperous growth of the United States, consequent on the liberal encouragement of European immigration. But, while anxious to encourage immigration of foreigners, they nevertheless entertained some jealousy, well founded, perhaps, that in case of conflict with a powerful neighbor their sympathies and allegiance might not be safely relied on.

"Hence the caution exhibited in requiring the approval of the supreme government 'to grants made to impresarios' for them to 'colonize with many families.' But while a judicious policy might forbid the settlement of large bodies of foreigners on the boundaries and seacoast, we cannot impute to them the weakness, or folly, of confining their native citizens to the interior, and thus leaving their seacoast a wilderness without population. On the contrary, the same considerations of policy which excluded foreigners would encourage the settlement of natives within those bounds. The statute books of Mexico abound in acts offering every inducement to Mexican families to settle on the frontiers; proffering gratuitous grants of land and of agricultural implements, expenses of their voyage, maintenance for a year, and leave to import certain articles free of duty. The military posts in the territory were on the seacoast; and it would be strange policy indeed which

would isolate the posts, intended for the protection of settlers, and compel them to dwell among the savages without protection. Numerous enactments, also, exhibit their cautious jealousy with respect to foreigners, and especially their coterminous neighbors on the north. An act of 1828 directs all Spaniards living on the coast of the Mexican Gulf to retire 20 leagues from it. Another, of 1830, prohibits settlements of foreigners from coterminous nations or any part of their border states.

"A careful examination of this decree of 1824, and regulations of 1828, will show that their letter conforms to this policy, pursued with so much solicitude. The title to the decree shows its subject to be 'colonization.' The term 'colonization' implies immigration in numbers. The first section speaks of the subjects of such colonization as 'foreigners.' It guarantees to them security of person and property. The second and third describe the lands open to such colonists, and require the states to make rules and regulations for colonization within their limits. The fourth (whose construction is now under consideration) forbids the colonization of the territory comprehended within 20 leagues of the boundaries of any foreign state, and within 10 leagues of the seacoast, without the consent of the supreme executive power. The sixth section provides that no duties shall be imposed on the entrance of 'foreigners.' The seventh forbids the immigration of 'foreigners' to be prohibited prior to 1840, except of some particular nation, and under peculiar circumstances. The seventh indicates the possibility that the government may find it necessary to take measures of precaution for the security of the federation with respect to foreigners who come to colonize.

"These are all the sections of the act which refer directly to colonization. The subjects of it are called 'foreigners' throughout. They are the only persons to whom the fourth section has any reference or application. The ninth section first speaks of the 'distribution of lands' to individuals and families, as distinguished from colonists, and provides that Mexican citizens should be preferred, without distinction of classes. except as to those who have rendered special service to their country. Thus we have seen that the first eight sections apply wholly to colonists and foreigners. It would be contrary to every canon of construction to apply the provisions made for them to the subject introduced for the first time in the 9th section, or to select the fourth section as applicable to native citizens, while the other seven are confined by their terms to 'foreigners.'

"The regulations of 1828, made for the purpose of carrying into execution the law of 1824, evidently give this construction to that act. It makes a clear distinction between empresario contracts for colonization, and grants to Mexican citizens. In conformity with the fourth section of that act, it requires grants to empresarios to have the sanction of the supreme government, while those made to individuals or families need only the approval of the territorial deputation. This may be said to be a legislative construction of the act of 1824, and demonstrates that this restraint of grants within the lateral [sic] leagues had no application except to colonies of foreigners."

Necessarily, the District Court, in confirming this grant, was guided by the decision in the Arguello Case. Article 5 of the act of 1824 was not involved in the Arguello Case, except incidentally; but the reasoning in that case necessarily precludes the idea that article 5 could apply to citizens of Mexico, while all the other articles from 1 to 8, inclusive, apply only to foreigners. It will be seen that the Supreme Court includes article 5 among the eight articles, which it holds apply to foreigners, and not to citizens. We might well use the language of the Supreme Court, above quoted, making the reference to article 4 read article 5, thus:

"We have seen that the first eight sections [or articles] apply wholly to colonists and foreigners. It would be contrary to every canon of construction to apply the provisions made for them to the subject introduced for the first

time in the ninth section, or to select the *fifth* section as applicable to native citizens, while the other seven are confined by their terms to foreigners." (Italics ours.)

It would also seem that the Mexican government could with as much propriety have made a distinction between a Mexican citizen and a foreigner, concerning the right of occupancy as provided in article 5, as to have made the distinction in article 4. It seems to the court that this decision of the Supreme Court of the United States is controlling upon this court.

The court might well stop here, without further comment; but the question of res adjudicata has been carefully investigated, and it is not inappropriate to make the following comment:

Section 15 of the Act of March 3, 1851, provides:

"That the final decrees rendered by the said commissioners, or by the District or Supreme Court of the United States, or any patent to. be issued under this act, *shall be conclusive between the United States and the said claimants only*, and shall not affect the interests of third persons."

In construing this section, the Supreme Court, in the case of Botiller v. Dominguez, 130 U. S. 238, 248, 9 Sup. Ct. 525, 527 (32 L. Ed. 926), says:

"The fifteenth section declares that the final decrees rendered in such cases, or any patent issued under the act, 'shall be conclusive between the United States and the said claimants only'; that is to say, *it shall be conclusive on the United States* and on the claimants, but it shall not conclude the rights of anybody else, if in a position to contest the action of the board. * * * When this was done, the aim of the statute was attained. The order of the commissioners or the decree of the court established as between the United States and the private citizen the validity or the invalidity of such claims, and enabled the government of the United States, out of all its vast domain, to say 'this is my property,' and also enabled the claimant under the Mexican government who had a just claim, whether legal or equitable, to say 'this is mine.' This was the purpose of the statute; and it was equally important to the object which the United States had in the passage of it, that claims under perfect grants from the Mexican government should be established as that imperfect claims should be established or rejected. * * * We are unable to see any injustice, any want of constitutional power, or any violation of the treaty, in the means by which the United States undertook to separate the lands in which *it held the proprietary interest* from those which belonged, either equitably or by strict legal title, to private persons."

In the Botiller Case the court was deciding a controversy between two claimants in an action wherein the United States was not a party, but what the court said in that case is appropriate to a decision in the case at bar. The statute and said decision is to the effect that the patent shall be conclusive on the United States. Certainly, if it is conclusive on anybody, in view of this statute, it ought to be conclusive on the United States. A patentee under this statute could not assert with very much confidence, concerning the land he got, that "this is my property," if the United States could step in at any time and take possession of it forever.

This court is of the opinion that the claim of the plaintiff is not well made for the foregoing reasons.