## MILLER v. YATES et al. (No. 2246.)

Court of Civil Appeals of Texas. El Paso.
March 16, 1929.

Rehearing Denied April 4, 1929.

Jos. G. Montague, of Fort Stockton, and Boyle, Wheeler & Gresham, of San Antonio, for appellant.

Hill, Smith & Neill, of San Angelo, Baker, Botts, Parker & Garwood, of Houston, Burney Braly, of Fort Worth, C. L. Carter, of Houston, and John Rogers, of Tulsa, Okl., for appellees.

HIGGINS, J. • This is an action in trespass to try title and for damages brought by appellant, Mrs. Addie Miller, surviving wife and devisee of M. C. Miller, who died in 1915, against I. G. Yates and others holding oil and gas leases under Yates.

Upon peremptory charge there was verdict and judgment for defendants.

The land sued for is in two tracts, each being approximately 625 varas wide from north to south, and 1,900 varas long.

On March 15, 1882, certificates numbered 2302 and 2303, for 640 acres each, were issued to the Texas Central Railway Company under the provisions of chapter 12, tit. 84, R. S.

1879. By transfer dated April 8, 1882, filed in the General Land Office April 13, 1894, these certificates were transferred to "M. C. Miller, Trustee, heirs or assigns."

By application for survey filed with the county surveyor of Pecos county on February 11, 1887, Miller located the certificates upon vacant land lying between the Runnels county school land on the north and block 194, G. C. & S. F. Ry. survey on the south. The land was surveyed by O. W. Williams, deputy surveyor of Pecos county, on February 16, 1887. The field notes, with the application for the survey and certificates, were filed in the General Land Office March 3, 1887. The surveys were numbered 101, 102, 103, and 104, Nos. 102 and 104 being the alternate school sections reserved to the state. Each survey contained 640 acres, was in square form, each boundary line being 1,900 varas long. The N. W. corner of survey 101 was fixed at the southwest corner of the Runnels county school land, from which corner its lines ran east, south, west, and north, to the beginning. The succeeding surveys were constructed to the east upon 101.

According to the testimony of the surveyor, Williams, the Land Office claimed the surveys were in conflict with block 194 on the south, refused to patent on that account, and required corrected field notes, which he prepared September 16, 1892, filed in the General Land Office March 3, 1893.

S. C. Clark, chief draftsman of the General Land Office, testified in part as follows:

"The original of this map appears to have been in use in this office as the official map of Pecos County prior to the map of 1895. From an examination and consideration of such map which was then on file in the General Land Office and in use by that Department at the time of the filing of the original field notes to said sections 101 and 103 under certificates 2302 and 2303, T. C. Ry. Co. in Pecos County, it does not appear that the entire area lying between the Runnels County School Land and Block 194, G. C. & S. F. Ry. Co., was sufficient in extent to permit the location of the two surveys of 640 acres each in accordance with the original field notes made up and filed in the Land Office to satisfy the two certificates mentioned."

And, further:

"In canceling the original field notes covering both sections of land mentioned, and the issuing of patents to M. C. Miller as assignee of the T. C. Ry. Co. on each certificate for 407 acres, known as sections 101 and 103, Pecos County, and based upon corrected field notes—the Land Office maps or plats on file at the time indicate or show that the corrected field notes covered the entire space between the south line of the Runnels County School Land and Block 194, G. C. & S. F. Ry. Co., causing the south lines of sections 101, 102, 103 and 104, T. C. Ry. Co., to appear to be the same as the north line of Block 194,

G. C. & S. F. Ry. Co., and to their extent said lines were made to appear as coinciding with said north line of Block 194." "The official map referred to in direct interrogatory No. 7 bears no date, but appears to have superseded the old map of Pecos County dated 1873, and was in use up to 1895, when it was superseded by the map of Pecos County of that date. I do not know of any correction of the official map referred to, except that it was superseded by a new map compiled in 1895."

The only material difference between the original and corrected field notes is that the east and west boundary lines in the corrected notes are 1,209 varas long instead of 1,900 varas as in the original.

The original field notes of surveys 101 and 102, as they now appear in the Land Office, upon their face, bear this indorsement, "Canceled by corrected notes," and the original field notes of surveys 103 and 104, upon their face, bear the indorsement, "Canceled by corrected field notes." The Commissioner of the General Land Office, Hon. J. T. Robison, testified these indorsements were in the handwriting of Ernest Von Rosenberg, then draftsman in the Land Office.

Upon the corrected field notes patents to surveys 101 and 103 were issued April 14, 1894, to M. C. Miller, "assignee of the Texas Central R. R. his heirs or assigns."

On November 28, 1896, M. C. Miller conveyed to the City National Bank of Austin, Tex., among other lands, 407 acres known as survey 101, block 194, being patent No. 77, vol. 109, and 407 acres known as survey 103, block 194, being patent No. 78, vol. 109.

The omitted portions off of the south ends of survey 101 and survey 103, as originally located and surveyed, constitute the two tracts of land in controversy. At the time the original location was made and up until about 1919 the Land Office maps and records showed only a sufficient strip of land north and south, between the Runnels county school land on the north and block 194 on the south, to accommodate the four surveys of 407 acres each. However, as a matter of fact there was sufficient vacant, unappropriated land between the Runnels county school land and block 194 to accommodate the four surveys of 640 acres each as originally located and surveyed.

This fact, however, was not known to the Land Office until about 1919, as a result of investigation and survey by Capt. Dod, state surveyor. There is nothing in the record to show that either the Commissioner of the General Land Office or M. C. Miller were aware of the true facts during M. C. Miller's lifetime. When the two patents were issued there was indorsed across the face of each original certificate the following: "407 acres. Patented April 14, 1894. W. L. McGaughey." It was shown that W. L. McGaughey was the Commissioner of the General Land Office at the time. The two certificates remained in

the Land Office, and no certificate for unlocated balance was taken out.

Upon the facts disclosed by Capt. Dod's survey, Yates applied to purchase as vacant the land lying between the south line of the land patented to Miller and the north line of block 194. It was sold and awarded to him February 4, 1921, by the Commissioner of the General Land Office, without condition of settlement, and patent issued April 13th, 1927.

It is unnecessary to consider the assignment complaining of the admission of certain testimony of the witness Williams. Without regard to the testimony objected to the peremptory charge was properly given. In reaching this conclusion such testimony may be and is disregarded.

Appellant's propositions, other than the one relating to such testimony, are predicated primarily upon the theory that Miller became the owner of the land in controversy by virtue of his ownership of valid certificates under which the land was surveyed, and the field notes with the certificates returned as by law required to the General Land Office, and that he did not lose such title by his subsequent acceptance of the patents based upon the corrected field notes. Reliance is placed upon those decisions, which hold that one who has located a valid land certificate upon vacant public land, caused the same to be surveyed, and the survey and certificate returned to the General Land Office within the time prescribed by law, acquires a vested right and title to the land sufficient to maintain an action in trespass to try title. Snider v. Methvin, 60 Tex. 487; Hamilton v. Avery, 20 Tex. 612; Duren v. Ry. Co., 86 Tex. 287, 24 S. W. 258, and other cases which hold that a vested title to land cannot be lost by mere abandonment but only by some act or deed legally sufficient to operate as a divestiture of title; Dikes v. Miller, 24 Tex. 417.

The authorities in this state upon facts similar to the case at bar are uniformly against appellant's contention.

In Montgomery County v. Angier, 32 Tex. Civ. App. 451, 74 S. W. 957, it was said:

"This is an action of trespass to try title brought by the appellant against the appellee to recover a tract of 160 acres of land in Walker county. The land in controversy is a part of a 320-acre survey located on August 12, 1857, by virtue of a certificate issued January 24, 1857, for an unlocated balance of certificate No. 1,081 for one-third of a league of land issued to the heirs of John Heyser on February 12, 1839, and is also covered by a location made for Montgomery county on August 20, 1857. A patent was issued to Montgomery county for said land on December 5, 1874.

"The plaintiff claims title under the heirs of John Heyser. The Commissioner of the Land Office refused to patent the land to the heirs of John Heyser because of the conflict with the Montgomery county survey, and on September 20, 1900, plaintiff procured a survey of the land to be made, leaving out that portion in conflict with the Montgomery county patent, and on September 25, 1900, filed the field notes of said survey in the General Land Office as corrected field notes of the John Heyser survey. Upon the filing of these field notes, the field notes of the original location were canceled, and patent issued to the heirs of John Heyser for the land included within the boundaries of the corrected field notes. Plaintiff's title to the John Heyser survey is deraigned through Adam and Elizabeth Heyser, who conveyed said survey to John Y. Hill by deeds dated June 16, 1838, and April 14, 1854, respectively. * * *

"It is unnecessary for us to determine the question of the sufficiency of the evidence to sustain the finding of the lower court that Adam and Elizabeth Heyser, under whom plaintiff claims title, were the heirs of John Heyser, because the plaintiff voluntarily procured the cancellation of whatever title the heirs of John Heyser may have had to the land in controversy. The filing in the General Land Office by plaintiff of corrected field notes of the John Heyser survey, and the procurement by him of a patent to the John Heyser survey as described in said field notes, was an abandonment of any claim he might have had under the field notes of the original survey to land not included in the corrected field notes. The only evidence of title to the land in controversy in the heirs of John Heyser was the field notes of the original survey. When a new survey of the Heyser location was made by plaintiff, and the field notes of said survey filed in the Land Office by him as corrected field notes of the original location, and a patent obtained for the John Heyser survey as described in said field notes, such corrected field notes superseded the original field notes, and rendered them void for all purposes. The cancellation of the original field notes destroyed the only title which plaintiff had to the land in controversy, and judgment should have therefore been rendered for the defendant. Plaintiff testified that he did not intend to abandon his claim to the land in controversy by filing corrected field notes of the John Heyser survey and obtaining a patent thereon which did not include the land in controversy, but this is immaterial. The effect of the filing of the corrected field notes and the issuance of a patent thereon at the request of plaintiff was to cancel the original field notes, and thus annul the only title under which plaintiff claimed the land in controversy, and this result was accomplished regardless of plaintiff's intention."

Jones v. Petty (Tex. Civ. App.) 146 S. W. 663, was action in trespass to try title involving the location of a tract of land known as the Hanks survey, patented in 1855, and in conflict with the Brown survey, which was first surveyed in 1852. The owners of the

Brown survey contended that the land in controversy was a part of that survey by reason of its being embraced in the bounds of their original field notes, which were made three years before the patent to the Hanks survey. It is expressly made to appear that the Brown survey was patented in 1898 on the corrected field notes thereof filed in September, 1897. The court said: "Having accepted the patent according to the corrected field notes, the original grantee and those claiming under him cannot now maintain any claim to the land included in the original survey, and excluded from the corrected survey and the patent."

In Garcia v. State (Tex. Civ. App.) 274 S. W. 319, the following state of facts was involved: In 1830 the Mexican government made a grant of two leagues known as the Los Ojulos to one Gutierres. The Mexican surveyor, in accordance with his custom, drew a sketch of his survey, designating the corners by name and calling for the distances between them. Gutierres left the land and returned to Mexico, the date thereof not being shown. However, his heirs returned to Texas and located the grant after Texas became a state. In 1856 they caused it to be surveyed by one Trimble, district surveyor of Webb county, who filed his field notes in the General Land Office. In 1861 the heirs filed a suit in the district court against the state under the Act of February 11, 1860, seeking to have title to the whole grant confirmed in them; but judgment was not rendered in the case until July, 1871. It confirmed title in the two leagues in the heirs of Gutierres, and in 1873 the land was patented to the heirs under the field notes made by Trimble in 1856 by virtue of the decree of court mentioned. The suit in which the opinion was rendered was brought by the state against the heirs of Gutierres, and those claiming under them, to recover 608 acres of land which appellants claimed to be part of Los Ojulos grant, but which was not included within the bounds of the field notes as set out by Trimble after his survey. Appellants claimed title to this particular land by virtue of the original survey as made by Canales, the Mexican surveyor. The court said: "When the heirs of Gutierres returned to the land from Mexico in 1855 or 1856, had it resurveyed by the district surveyor, Trimble, had the land patented to them under his field notes, accepted such patent, and are claiming under it, they are bound by his survey, and the survey made by Canales is immaterial. Their title and boundaries thus became fixed and determined under the resurvey, and the old Canales survey as such was abandoned"—Citing Sullivan v. State, 41 Tex. Civ. App. 89, 95 S. W. 645, Hamilton v. State (Tex. Civ. App.) 152 S. W. 1117, and Montgomery County v. Angier, supra.

In Sullivan v. State, 41 Tex. Civ. App. 89, 95 S. W. 645, the suit was by the state to determine the location and boundaries of a Mexican grant under which Sullivan claimed title to the land in controversy, and to recover the quantity of land claimed by Sullivan in excess of that embraced within the exact boundaries of the original grant. The state recovered in the court below. It appears that Sullivan's claim emanated from a Mexican grant of 6½ leagues made to one Garza in 1832, and confirmed by a legislative act passed in 1852. That act provided that it was the duty of claimants under Mexican grants to have the land surveyed by the district or county surveyor and that upon return of field notes thereof to the General Land Office, the Commissioner was authorized and required to have same platted on maps of his office, and issue patents therefor; provided that no patent should issue for a less amount than the original grant. In pursuance of such provision the survey was made by one Von Blucher in 1859 and filed in the Land Office August, 1869. The land embraced in its original grant was surveyed by Canales, Surveyor General of the state of Tamaulipas, in 1832, and field notes made out with a map accompanying same showing the boundaries and the quantity to be 6 leagues. The survey made by Blucher contained 10 leagues and 17½ labors. In holding that appellants were not entitled to defeat the state's recovery of the land outside the bounds of the field notes as set forth in their patent on account of these prior surveys, the court said: "The holding of the Court in confining the surveys situated on the east and west of the Arriba to their boundaries as patented, was correct. The owners of these surveys, by acceptance of the patents, relinquished all claims to any land that may have been included in the grant confirmed, but not embraced in their patents." Citing U. S. v. Roselius, 15 How. 31, 14 L. Ed. 587; De Arguello v. U. S., 18 How. 546, 15 L. Ed. 478; Forbes v. Withers, 71 Tex. 302, 9 S. W. [154] 164.

Hamilton v. State (Tex. Civ. App.) 152 S. W. 1117, in which a writ of error was refused, is another case involving substantially the same question discussed in Garcia v. State. The suit was by the state against Hamilton to recover land designated on the map shown in the opinion. The court made the following statement in disposing of the objections to the admission of field notes and patent offered by the state upon the ground that the owners of the Spanish grant were not bound by an erroneous survey made by the state: "It is true that owners of a valid Spanish grant would not be bound by an erroneous survey of the same made by the state, nor by a patent issued on such survey, if they did not accept the same; but, if they did not object to said survey and accepted the land granted in said patent, they would be bound by such patent. There is no direct evidence that the owners of the Guerra accepted the

734

land thus patented, but there is no intimation in the record in [of] this case that they did not accept the same; and as the grant to them by the state did not define the location of the land, and as they were required by said act to have their land surveyed, and the field notes returned to the land office, and as such survey and patent, which definitely pointed out the land granted to them, inured to their benefit, in the absence of evidence to the contrary, it will be presumed that they accepted said patent. * * * This applies to patents to public lands." Citing Mitchell v. Ryan, 3 Ohio St. 387; Halluck v. Bush, 2 Root (Conn.) 26, 1 Am. Dec. 60; Ford v. Boone, 32 Tex. Civ. App. 550, 75 S. W. 353; Dikes v. Miller, 24 Tex. 423. See, also, Austin v. Dungan, 46 Tex. 236.

We regard the ruling in the cases cited as peculiarly applicable here in view of articles 3918, 3919, and 3920, R. S. 1879, which read:

"Art. 3918: If, upon examination of the field-notes of a survey in the general land-office, they are found to be incorrect, it shall be the duty of the commissioners to cause a plain statement of the errors, with a sketch of the map, to be forwarded by mail or by the party interested, to the surveyor who made the survey, with a requisition to correct the same and return corrected field-notes to the general land office.

"Art. 3919: It is hereby made the duty of surveyors who shall have made and delivered incorrect field-notes, upon the requisition of the commissioner of the general land office, provided for in the preceding article, or of the party interested, to make corrected field-notes and return the same to the general land office without delay and without any additional compensation.

"Art. 3920: When a conflict of surveys does not exist on the ground, but appears only on the maps or in the field-notes, it shall only be required of the surveyor to make an official certificate of the facts and furnish a true sketch of the survey with its connections."

These statutory provisions authorized the correction of the original field notes because of the apparent conflict shown by the records of the General Land Office, and provided a method for the relief of the locator if in fact there was no conflict on the ground.

Under the quoted statutory provisions we are of the opinion the Commissioner of the General Land Office was authorized to require correction of the original field notes because of such apparent conflict, and, such correction having been acquiesced in by Miller and patents accepted, based upon the corrected field notes, Miller and those claiming under him cannot thereafter assert any right to land embraced in the original field notes but excluded by the corrected notes. To hold otherwise would render corrections of original notes, under the law quoted, an idle ceremony, and of no force or effect. If such be the law, then one purchasing land can never safely rely upon patents issued by the state and accepted by the patentees, as correctly evidencing the limits of adjacent grants.

Under the cited authorities and statutory provisions we hold that Miller, by his acceptance of the patents issued upon the corrected field notes, lost all right to the land sued for, and the peremptory charge was properly given.

Affirmed.